## WILKES COUNTY *v.* COLER.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 167. Argued October 19, 22, 1900.—Decided March 18, 1901.

The decisions of the highest court of a State upon the question whether a particular act was passed in such manner as to become, under the state constitution, a law, should be accepted and followed by the Federal courts.

The principle reaffirmed that the recital in municipal bonds of a wrong act as authority for their being issued does not preclude a holder of such bond from showing that independently of such act there was power to issue the bonds.

The rule reaffirmed that the question arising in a suit in a Federal court of the power of a municipal corporation under existing laws to make negotiable securities is to be determined by the law as judicially declared by the highest court of the State at the time the securities were issued, and that the rights and obligations of parties accruing under such a state of the law would not be affected by a different course of judicial decisions subsequently rendered any more than by subsequent legislation.

THE ultimate question in this case is whether the county of Wilkes, North Carolina, is liable upon certain bonds issued in 1889 in payment of a subscription in its name to the capital stock of the North Western North Carolina Railroad Company.

Each bond was in the usual form of such instruments, was made payable October 1, 1913, and recited that it was " one of a series of one hundred bonds of the denomination of one thousand dollars each, issued by authority of an act of the General Assembly of North Carolina, ratified the 20th day of February, A. D. 1879, entitled ' An act to amend the charter of the North Western North Carolina Railroad for the construction of a *second division* from the towns of Winston and Salem, in Forsyth County, up the Yadkin Valley, by Wilkesboro, to Patterson's Factory, Caldwell County,' and authorized by a vote of a majority of the qualified voters of Wilkes County, by an election regularly held for that purpose on the 6th day of

November, A. D. 1888, and by an order of the Board of Commissioners of Wilkes County made on the first day of April, A. D. 1889. This series of bonds is issued to pay the subscription of one hundred thousand dollars made to the capital stock of the North Western North Carolina Railroad Company by said county of Wilkes."

The question of a subscription by Wilkes County to the extent of $100,000 to the stock of that company, to be paid in bonds, was submitted to a popular vote and a majority of the qualified voters approved of the proposition. Taxes were imposed and collected for eight years to pay the interest on the bonds and the amounts collected were so applied; but the county officers refused to pay the interest due and payable April 1, 1896, April 1, 1898, and October 1, 1898, although they had in their hands moneys collected from taxpayers for that purpose. The object of the present suit was to compel those officers to apply the moneys so collected in payment of such interest.

Was the act of 1879—which was recited in the bonds as authority for their being issued—passed by the legislature in such manner as to become a law of North Carolina? Was there power to issue the bonds without the aid of that enactment? These are the principal matters involved in or depending upon our answer to the certified questions.

The material facts upon which the decision of the case depends are as follows:

The Convention that assembled at Raleigh, North Carolina, on January 14, 1868, for the purpose of framing a constitution for that State concluded its labors on March 16, of the same year. The constitution adopted by that body was ratified April 24, 1868, and was approved by Congress, June 25, 1868. 15 Stat. 73, c. 70.

A few days prior to its final adjournment, namely, on the 9th day of March, 1868, the Convention passed an ordinance (which, by its terms, was to take effect from its passage) that constituted the charter of the North Western North Carolina Railroad Company. The company was incorporated by the ordinance for the purpose of constructing a railroad of one or more tracks

from some point on the North Carolina Railroad between the town of Greensboro in Guilford County and the town of Lexington in Davidson County, running by way of Salem and Winston in Forsyth County "to *some* point *in the northwestern boundary line* of the State *to be hereafter determined.*"

By the 5th section of the ordinance it was provided that after the organization of the company its officers should proceed "to locate the *eastern* terminus of the North Western North Carolina Railroad, and shall proceed to construct said road, with one or more tracks, as speedily as practicable, in sections of five miles each, to the towns of Winston and Salem, in Forsyth County, which portion of said railroad, when completed, shall constitute its *first division.*"

By the 12th section it was declared that "all *counties* or towns subscribing stock to said company shall do so in *the same manner* and *under the same rules, regulations and restrictions* as are set forth and prescribed in the act incorporating the North Carolina and Atlantic Railroad Company, for the government of such towns and counties as are now allowed to subscribe to the capital stock of said company;" and by section 13, that "the company shall have power to construct branches of said road, one of which shall run from the towns of Winston and Salem by way of Mount Airy, in Surry County, to the line of the State of Virginia."

The North Carolina and Atlantic Railroad Company referred to in the 12th section was the Atlantic and North Carolina Railroad Company incorporated by an act of assembly approved December 27, 1852. By the 33d section of the charter of that company it was declared to "be lawful for any incorporated town or county near or through which said railroad may pass to subscribe for such an amount of stock in said company as they shall be authorized to do by the inhabitants of said town or the citizens of said county, in manner and form as hereinafter provided." Provision was made (§ 34) in the same act to take the sense of the qualified voters of any town or county upon the question of a subscription by it to the stock of the company, and it was declared (§ 35) that if a majority of the qualified voters of any county or town voting upon

the question were in favor of the subscription, the corporate authorities of the town and the justices of the county should appoint an agent to make the subscription in behalf of such town and county, to " be paid for *in the bonds of such town and county,* and on such time as shall be agreed on by said town officers and the justices of such county." Laws North Carolina, 1852, pp. 484, 499.

By an act of assembly of August 11, 1868, the ordinance of March 9, 1868, was reënacted, ratified and confirmed. By the same act also the commissioners of Forsyth County were invested with authority to levy from time to time such tax as was sufficient to pay the subscriptions made to the capital stock of the North Western North Carolina Railroad Company, and any interest due thereon, or to liquidate any debt created in borrowing money to pay the subscription of stock. At the end of that act as published are the words, " Ratified the 11th day of August, A. D. 1868."

By the first section of the above act of February 20, 1879, it was declared that " section 13 of chapter 17 of the ordinance of the Convention of 1868, ratified the 9th day of March, 1868, be amended by adding the words—' and one of which shall be constructed from the town of Winston and Salem, up the valley of the Yadkin by the way of Jonesville *and Wilkesboro, in the county of Wilkes,* to Patterson's Factory, in the county of Caldwell, which branch shall be known as the *second division.*' " By the first and second sections the ordinance of 1868 was further amended in particulars that need not be mentioned. By the fourth section it was provided : " That any township or city, town, county or other municipal corporation of this State shall have power and authority to subscribe for and take any number of shares of capital stock of said company that a majority of the voters of such township or city, town, county or other municipal corporation may elect to take therein." After prescribing the mode in which the will of the people as to a subscription of stock should be ascertained, that section proceeded : " If the result of any such election shall show that a majority of the qualified voters of any township or city, town, county or other municipal corporation, favor the taking of the amount of stock

so voted for in such election, then the authorities who, by this act, are empowered to determine what amount of stock shall be taken, shall subscribe the amount of stock so voted for in said company, and shall have power to levy and collect taxes for that special purpose to pay for the said stock in installments as the same may become due, or, in case it shall not be deemed best to collect taxes to pay by taxation such subscription for stock, then such township or city, town, county or other municipal corporation shall have power to issue bonds for the purpose of raising money to pay for such subscription, and shall provide for the payment of interest upon such bonds, and also for the payment of said bonds when they become due: . . . ” At the close of that act, as published, are these words: “ Read three times in the General Assembly and ratified the 20th day of February, A. D. 1879.”

Another act was passed March 2, 1881. By that act the North Western North Carolina Railroad Company was authorized to extend and construct its line of road, or a branch thereof, to commence at or near Winston, in the county of Forsyth, through the counties of Forsyth, Davidson, Yadkin, Davie, Rowan and Iredell, or any or either of them, to Statesville, or some other point on the Western North Carolina Railroad, and to build and operate additional branches thereto, or from its present main line, to any important mines or manufactories in any of said counties, or counties adjacent to them; and any corporation, county, city, town or township interested therein was empowered to subscribe to stock for those purposes, or otherwise contribute to the work in such manner and amount as should be determined by the proper authorities of such corporation, county, city, town or township, and agreed on with the said North Western North Carolina Railroad Company. At the close of that act, as published, are the words: “ In the General Assembly, read three times and ratified this the 2d day of March, A. D. 1881.”

The validity under the constitution of the State of each of the above acts of March 11, 1868, February 20, 1879, and March 2, 1881, was questioned upon grounds presently to be stated.

In the Circuit Court judgment was rendered in favor of the plaintiffs, Coler & Co., who were found to be *bona fide* holders for value of some of the bonds. The case was carried to the Circuit Court of Appeals, and is now here upon questions certified under the judiciary act of March 3, 1891, c. 517, 26 Stat. 826.

The certified questions are as follows:

"1. Whether, upon the averments of the bill of complaint, answers, replications, orders, exhibits, and other evidence, and matters and things recited herein, the Circuit Court of the United States was bound in passing upon this case by the decisions of the Supreme Court of North Carolina in the following cases: *Commissioners of Wilkes County* v. *Clarence Call et al.*, 123 N. C. 308; *Bank* v. *Commissioners*, 119 N. C. 214; *Commissioners* v. *Snuggs*, 121 N. C. 394; *Rodman* v. *Washington*, 122 N. C. 39; *Commissioners* v. *Payne*, 123 N. C. 432, considered in connection with prior decisions of said court and the following provisions of the constitution of said State: Article 2, sections 14 and 16, and Article 5, sections 1, 4, 6, and 7, and Article 7, section 7.

"2. Whether, if the bonds and coupons in question were issued, put in circulation, and came to the hands of complainants, appellees, in due course of trade, for valuable consideration and without notice, and if there were at that time no decision of the Supreme Court of North Carolina adverse to these bonds or identical bonds issued under similar statutes, the bonds held by complainants are valid bonds.

"3. Whether there was any decision adverse to the validity of these bonds or identical bonds or any construction of the constitution or law of North Carolina which affected the question of their validity when they came in due course of trade and for valuable consideration and without notice other than such notice as the parties are assumed to have of existing provisions in the constitution and statutes of the State of their invalidity."

*Mr. A. C. Avery* for the Board of Commissioners of Wilkes County.

*Mr. John F. Dillon* and *Mr. Charles Price* for Coler & Co. *Mr. Harry Hubbard* and *Mr. John M. Dillon* were on *Mr. Dillon's* brief.

*Mr. R. O. Burton* on behalf of the Commissioners of Oxford, and *Mr. James E. Shepherd* on behalf of the Commissioners of Stanly County, each filed a brief by leave of court.

MR. JUSTICE HARLAN, after stating the facts as above stated, delivered the opinion of the court.

This being the case disclosed by the record, we proceed in our examination of such matters involved in the certified questions as are presented with sufficient distinctness to require notice at our hands.

The county insists that the bonds in question were issued in violation of the 14th section of Article 2 of the constitution of the State, which is in these words: "No law shall be passed to raise money on the credit of the State or to pledge the faith of the State, directly or indirectly, for the payment of any debt, or to impose any tax upon the people of the State, or to allow the counties, cities or towns to do so, unless the bill for the purpose shall have been read three several times in each house of the General Assembly, and passed three several readings, which readings shall have been on three different days, and agreed to by each house respectively, *and unless* the yeas and nays on the *second* and *third reading of the bill* shall have been *entered on the journal.*"

In support of the above proposition reliance is placed upon the cases named in the first of the certified questions.

We are asked whether the Circuit Court was bound to follow those decisions when considered in connection with prior decisions of the Supreme Court of North Carolina and with the above and other provisions of the state Constitution, by one of which it is declared that "each house shall keep a journal of its proceedings, which shall be printed and made public immediately after the adjournment of the General Assembly." Art. 2, § 16.

Premising that the journals of the two houses were put in evidence and that it did not appear therefrom that the yeas and nays, on the second and third readings of the acts of 1868, 1879 and 1881, respectively, were entered on the legislative journals, let us inquire as to the scope of the decisions in the above cases.

In *Bank* v. *Commissioners*, 119. N. C. 214, 220 (1896), which involved the validity under the 14th section of the state constitution of an act passed in 1891 authorizing a municipal subscription to the stock of a railroad company and the issuing of bonds in payment thereof; it was said: " This section of the constitution is imperative and not recommendatory, and must be observed ; otherwise this wise and necessary precaution inserted in the organic law would be converted into a nullity by judicial construction. . . . The point is one of transcendent importance, and is simply whether the people, in their organic law, can safeguard the taxpayers against the creation of state, county and town indebtedness by formalities not required for ordinary legislation, and must the courts and the legislature respect those provisions? This safeguard is section 14 of Article 2 of the constitution. . . . The journals offered in evidence show affirmatively that ' the yeas and nays on the second and third reading of the bill ' were not ' entered on the journal.' And the constitution, the supreme law, says that, unless so entered, no law authorizing State, counties, cities or towns to pledge the faith of the State or to impose any tax upon the people, etc., shall be valid. . . . The people had the power to protect themselves by requiring in the organic law something further as to acts authorizing the creation of bonded indebtedness by the State and its counties, cities and towns than the fact certified to by the speakers of three readings in each house, and ratification. This organic provision plainly requires, for the validity of this class of legislation, *in addition* to the certificates of the speakers, which is sufficient for ordinary legislation, the entry of the yeas and nays on the journals on the second and third reading in each house. It is provided that such laws are ' no laws,' *i. e.*, are *void unless* the bill for the purpose shall have been read three several times in each house

of the General Assembly and passed three several readings, which readings shall have been on three different days, and agreed to by each house respectively, *and unless the yeas and nays on the second and third reading of the bill shall have been entered on the journal.* This is a clear declaration of the nullity of such legislation unless this is done, and every holder of a state or municipal bond is. conclusively fixed with notice of this requirement as an essential to the validity of his bond. If he buys without ascertaining that constitutional authority to issue the bond has thus been given, he has only himself to blame. 1 Dill. Mun. Corp. 545, and cases cited. It is certainly in the power of the sovereign people in framing their constitution to require as a prerequisite for the validity of this class of legislation these precautions and the additional evidence in the journals that they have been complied with, over and above the mere certificate of the speakers which is sufficient for other legislation. That the organic law does require the additional forms and the added evidence of the journals is plain beyond power of controversy. . . . The certificate of the speakers is not good for more than it certified, *i. e.,* that the bill has been read three times in each house and ratified. And ordinarily that makes the bill a law. But *for this class of legislation* the constitution provides that the facts thus certified by the speakers will make no law unless it further appears that the yeas and nays have been recorded on the journals on the second and third reading in each house. The constitution makes the entry on the journals essential to the validity of the act."

These principles were again announced in *Commissioners* v. *Snuggs,* 121 N. C. 394, 398 (1897), which also involved the validity of county bonds issued in payment of a subscription to the capital stock of a railroad corporation. It appeared that the act relied on as authority for issuing them passed its third reading in the House of Representatives without any entry on the journal of the yeas and nays. The court said : " We are of opinion that it was competent to introduce the House journal as proof that the acts referred to were not passed according to the requirements of the constitution, and they estab-

lished that fact. That provision of the constitution (section 14 of Article 2) is mandatory, as we have decided in *Bank* v. *Commissioners*, 119 N. C. 214. It is the protection which the people, in convention, have thrown around themselves for the benefit of the minority as well as the majority. . . . The bill may, in point of fact, have been read three several times on three different days, and the yeas and nays have been actually called on the second and third readings and the presiding officers may have certified thereto, and yet, if the entry of the yeas and nays is not actually made on the journal, the constitution speaking with absolute clearness says that the failure of such entry is *absolutely* fatal to the validity of the act. The entry, showing who voted on the bill and how they voted, must be made before the bill can ever become a law. The constitution does not allow the certificate of the presiding officers or any other power to cure such an omission. The certificate of these officers will be taken as conclusive of the several readings in ordinary legislation, even if it could be made to appear that the journals were silent in reference thereto, because, in ordinary legislation, the directions of the constitution are not a condition precedent to the validity of the act. But, in that class of legislation, the purpose of which is to legislate under section 14 of Article 2 of the constitution, a literal compliance with the language of that section is a condition precedent and one which must be performed in its entirety before the bill can ever become a law."

These two decisions were followed in *Rodman* v. *Washington*, 122 N. C. 39, 41 (1898), and *Commissioners* v. *Payne*, 123 N. C. 432, 487 (1898).

The same question arose in *Commissioners of Wilkes County* v. *Call*, 123 N. C. 308, 310 (1898). That case involved the validity of the identical issue of bonds that are here in suit. Referring to its former decisions, above cited, the court said: "Under the authority of those decisions we are compelled to hold that the entire issue of these bonds is null and void for want of legislative authority. An act of the legislature passed in violation of the constitution of the State, or in disregard to its mandatory provisions, is to the extent of such repugnance

absolutely void; and all bonds issued thereunder bear the brand of illegality stamped upon their face by the hand of the law. The act under which these bonds profess to have been issued [the above act of February 20, 1879] was never legally passed and never became a law."

To the above cases we may add that of *State* v. *Patterson*, 98 N. C. 660, 662, 664, determined in 1887 before the bonds in question were issued. That was an indictment for selling spirituous liquors in a certain county wherein sales were prohibited by a supposed statute. Priv. Acts, N. C. 1887, c. 113, § 8. The defendant, under the plea of not guilty, claimed that the statute cited was void, because it had no enacting clause, that is the words, "The General Assembly of North Carolina do enact." The court, referring in its opinion to the constitutional provision that "the style of the acts shall be, 'The General Assembly of North Carolina do enact,'" Art. 2, § 21, and to the provision "that all bills and resolutions of a legislative nature shall be read three times in each house, before they pass into laws, and shall be signed by the presiding officers of both houses," Art. 2, § 23, held that the statute under which the prosecution was inaugurated was not a law. The court, among other things, said: "It thus appears that its framers, and the people who ratified it, deemed such provisions wise and important, the purpose being to require every legislative act of the legislature to purport and import upon its face to have been enacted by the General Assembly, and to be further authenticated by the signatures of the presiding officers of the two houses comprising that body. The purpose of thus prescribing an enacting clause—'the style of the acts'—is to establish the act—to give it permanence, uniformity and certainty—to identify the act of legislation as of the General Assembly—to afford evidence of its legislative, statutory nature, and to secure uniformity of identification, and thus prevent inadvertence, possible mistake and fraud. Such purpose is important of itself, and as it is of the constitution, a due observance of it is essential. The manner of the enactment of a statute is of its substance. This is so in the nature of the matter, as well as because the constitution makes it so."

After the decision in *State* v. *Patterson*, rendered as above stated before the bonds in suit were issued, it might have been anticipated that the same court would hold as they did in the subsequent cases above cited that the entering of the yea and nay vote on the second and third readings of an act of the class mentioned in section 14 of Article 2 of the state constitution was a condition precedent that could not be dispensed with under any circumstances.

The defendants however contend that by the decisions of the Supreme Court of North Carolina, as those decisions stood at the time the bonds were issued, a person consulting the laws of the State was not bound to examine the journals of the legislature and ascertain at his peril whether such acts had been passed in the particular manner prescribed by the constitution; that every one could properly assume that the act of February 20, 1879, signed by the proper officers, and enrolled and published as one of the statutes of the State, was passed in conformity with the constitutional provision as to the entry on the journal of the yea and nay vote on the second and third readings of a bill.

The North Carolina cases cited by the defendants in support of this proposition are *Brodnax* v. *Groom*, 64 N. C. 244 (1870), *Gatlin* v. *Town of Tarboro*, 78 N. C. 119 (1878), and *Scarborough* v. *Robinson*, 81 N. C. 409 (1879). Let us see what was involved in those cases.

In *Brodnax* v. *Groom* it was held that the courts could not go behind an enrolled act, duly certified by the presiding officers of the two houses of assembly, to ascertain whether there had been a compliance with the 12th section of Article 2 of the state constitution providing that the " General Assembly shall not pass any private law unless it shall be made to appear thirty days' notice of application to pass such a law shall have been given, under such direction and in such manner as shall be provided by law."

In *Gatlin* v. *Town of Tarboro*, the question was as to the validity of a tax levied by a town, which was resisted on the ground that the act was private and had been passed without any notice of the application as required by the constitution

(Art. 2, § 12), and was therefore void—the parties admitting that no such notice was given. The court said : "As to the second point : If it appeared from the act itself, or affirmatively appeared by the journals of the legislature, which would have been competent evidence, that the notice of the intended application for the act, which the constitution requires, had not been given, we should probably hold the act void. We have not consulted the journals. That was evidence to be offered in the court below. Probably they are silent as to the fact whether it appeared that the required notice had been given or not. In that case we think the presumption would be that the legislature had obeyed the constitution, and that it appeared that notice had been given. ' *Omnia præsumuntur rite esse acta.*' We cannot accept the agreement of the parties that no notice was in fact given, as proof that it did not appear to the legislature that the required notice had been given. In such a case the best and only proof is by the record. Our opinion on this point is supported by a recent decision in Illinois. *Happel* v. *Brethaner,* 70 Ill. 166. If any weight were allowed to admissions of this sort, the law might change as each case was presented. Our opinion on this point renders it unnecessary to determine whether the act was technically a public or private one."

In *Scarborough* v. *Robinson*, the issue presented was as to the power of the court to compel the presiding officers of the two houses *to sign* an act to the end that it might be authenticated —it being alleged that the bill had been duly ratified by the two houses as shown by their respective journals. That case arose under section 23 of Article 2 of the state constitution providing that all bills and resolutions of a legislative nature should be read three times in each house, before they pass into laws, "and shall be signed by the presiding officers of both houses." Preliminary to the decision of the question really involved in that case the court made some general observations upon the question whether the existence and validity of a statute should depend " upon the uncertain results of an inquiry made in each particular case, whether the provisions of the constitution directing the mode of legislative proceedings have been followed in the action of the two houses in passing a bill through

its different stages of progress." But it was added that the determination of that question was not necessary to a decision of the application before the court. It was then decided, and nothing more was decided than, that "the signatures of the presiding officers of the two houses, under and by force of the words used in our constitution, are an essential prerequisite to the existence of the statute—the finishing and perfecting act of legislation—and must be affixed during the session of the General Assembly." Upon that ground only the application for a mandamus was denied.

It thus appears that no one of the cases cited by defendants involved a construction of section 14 of Article 2 of the state constitution. Those cases arose under other provisions of the constitution. It is true that in *Scarborough* v. *Robinson*, there are general expressions touching questions adverted to but not decided, that lend apparent support to the contention that the North Carolina decisions rendered after the issuing of the bonds in suit were not, in all particulars, in harmony with what was said by the state court in prior cases. But such general expressions as to matters expressly excluded from decision are not authority and reference must be had to the points in judgment.

In view of the cases determined by the highest court of North Carolina involving the precise point now under consideration, was the Circuit Court of the United States justified in holding the acts of 1868, 1879 and 1881 to be laws of the State? Observe that the issue is not as to the construction, meaning or scope of a statute, but whether that which purports to be a legislative enactment ever became a law for any purpose. May a Federal court disregard the decisions of the highest court of the State holding that such enactment, in the form of a statute, was never passed so as to become, under the state constitution, a law?

These questions have been so distinctly answered by this court in cases heretofore decided that a discussion of them upon principle is unnecessary.

In *Town of South Ottawa* v. *Perkins*, 94 U. S. 260, 267, 268, which was an action upon municipal bonds, the question was

whether any such statute ever existed as that under the authority of which the bonds there in suit purported to have been issued. It was contended that as the bonds were held by a *bona fide* purchaser for value, and as the town sued had paid the first instalment of interest, it was estopped from offering any evidence that the act under the authority of which the bonds purported to have been issued was not legally passed, the same having been duly published among the printed statutes as a law, and being therefore *prima facie* a valid law; in other words, that although the act might not have been duly passed, the town, under the circumstances of the case, was estopped from denying its passage. This court said : " We cannot assent to this view. There can be no estoppel in the way of ascertaining the existence of a law. That which purports to be a law of a State is a law, or it is not a law, according as the truth of the fact may be, and not according to the shifting circumstances of parties. It would be an intolerable state of things if a document purporting to be an act of the legislature could thus be a law in one case and for one party, and not a law in another case for another party ; a law to-day, and not a law to-morrow ; a law in one place, and not a law in another in the same State. And whether it be a law, or not a law, is a judicial question, to be settled and determined by the courts and judges. The doctrine of estoppel is totally inadmissible in the case. It would be a very unseemly state of things, after the courts of Illinois have determined that a pretended statute of that State is not such, having never been constitutionally passed, for the courts of the United States, with the same evidence before them, to hold otherwise."
" As a matter of propriety and right, the decisions of the state courts on the question as to what are the laws of the State is binding upon those of the United States. But the law under consideration has been passed upon by the Supreme Court of Illinois, and held to be invalid. This ought to have been sufficient to govern the action of the court below. In our judgment, it was not necessary to have raised an issue on the subject, except by demurrer to the declaration. The court is bound to know the law without asking the advice of a jury on the subject. When once it became the settled construction of the con-

stitution of Illinois that no act can be deemed a valid law unless, by the journals of the legislature, it appears to have been regularly passed by both houses, it became the duty of the courts to take judicial notice of the journal entries in that regard. The courts of Illinois may decline to take that trouble, unless parties bring the matter to their attention; but, on general principles, the question as to the existence of a law is a judicial one, and must be so regarded by the courts of the United States."

These principles were reaffirmed in *Post* v. *Supervisors* (*Amoskeag Bank* v. *Ottawa*), 105 U. S. 667.

It is said, however, that the Circuit Court of the United States could not have followed the cases referred to in the certified questions without departing from the principles announced by this court in *Field* v. *Clark*, 143 U. S. 649, 671, 672. This point deserves examination.

In the present case, the express mandate of the constitution of North Carolina is that " no law shall be passed . . . to impose any tax upon the people of the State or to allow the counties, cities or towns to do so . . . unless the bill for that purpose shall have been read three several times in each house of the General Assembly, and passed three several readings, which readings shall have been on three different days, and agreed to by each house respectively; *and unless* the yeas and nays on the second and third reading of the bill shall have been entered on the journal." Whether the absence from the journal of entries showing the required number of *readings* of a bill, on three different days, will be notice to all that the legislature has not conformed to the requirements of the constitution in respect of such readings, is a question that need not be decided in this case. As the state constitution does not expressly require those facts to be entered on the journal of legislative proceedings, it may be that when an enrolled bill, certified and duly authenticated by the presiding officers of the two houses, is approved by the Governor, it is to be conclusively presumed that the constitution was complied with as to the mere readings of the bill. Without however expressing any opinion on that question, we remark that no such conclusive presumption can arise to defeat the express constitutional in-

hibition upon the passage of an act authorizing a county, city or town to impose taxes upon its people unles., "the yeas and nays on the second and third reading of the bill shall have been entered on the journal." The object of that provision was to make such an entry on the journal a condition precedent to any legislation imposing taxes on the people. Every one who took municipal bonds to be paid by means of taxation authorized by the legislature was bound to know, from the face of the constitution, that there was a want of power to issue such bonds and to impose such taxation, if the yeas and nays on the second and third readings of the bill were not entered on the journal. The constitutional requirement in that matter could not be dispensed with by the act of the presiding officers of the two houses of the General Assembly in certifying a bill as passed when the journal did not contain entries showing that to have been done which was necessary to be done before there was power to enact the bill into a law. These are the grounds upon which the Supreme Court of North Carolina have rested their decisions in the cases referred to in the first of the certified questions.

The case of *Field* v. *Clark* was altogether different. In that case it was contended that a certain enrolled act of Congress in the custody of the Secretary of State and appearing upon its face to have become a law in the mode prescribed by 'the Constitution of the United States, was to be deemed a nullity in all its parts because it was shown by the congressional record of proceedings, reports of committees of each house and other papers. printed by authority of Congress that a section of the bill as it finally passed was not in the bill authenticated by the signatures of the presiding officers of the respective houses of Congress and approved by the President. The clause of the Constitution upon which that contention was based declares that "each house shall keep a journal of its proceedings, and from time to time publish the same, except such parts as may in their judgment require secrecy; and the yeas and nays of the members of either house on any question shall, at the desire of one fifth of those present, be entered on the journal." Art. 1, § 5. It was not claimed in that case that a yea and nay vote was demanded by one fifth of the members of either house on the passage of the

section alleged to have been omitted, or on the passage of the bill as approved by the two houses of Congress. This court said: "In regard to certain matters, the constitution expressly requires that they shall be entered on the journal. To what extent the validity of legislative action may be affected by the failure to have those matters entered on the journal, we need not inquire. No such question is presented for determination. But it is clear that, in respect to the particular mode in which, or with what fullness, shall be kept the proceedings of either house relating to matters not expressly required to be entered on the journals; whether bills, orders, resolutions, reports and amendments shall be entered at large on the journal, or only referred to and designated by their titles or by numbers; these and like matters were left to the discretion of the respective houses of Congress. Nor does any clause of that instrument, either expressly or by necessary implication, prescribe the mode in which the fact of the original passage of a bill by the House of Representatives and the Senate shall be authenticated, or preclude Congress from adopting any mode to that end which its wisdom suggests. Although the constitution does not expressly require bills that have passed Congress to be attested by the signature of the presiding officers of the two houses, usage, the orderly conduct of legislative proceedings, and the rules under which the two bodies have acted since the organization of the Government, require that mode of authentication." It was then said: "The signing by the Speaker of the House of Representatives, and by the President of the Senate, in open session, of an enrolled bill, is an official attestation by the two houses of such bill as one that has passed Congress. It is a declaration by the two houses through their presiding officers, to the President, that a bill, thus attested, has received, in due form, the sanction of the legislative branch of the Government, and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him. And when a bill, thus attested, receives his approval, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable. As the President has no authority

to approve a bill not passed by Congress, an enrolled act in the custody of the Secretary of State, and having the official attestations of the Speaker of the House of Representatives, of the President of the Senate, and of the President of the United States, carries on its face a solemn assurance by the legislative and executive departments of the Government, charged, respectively with the duty of enacting and executing the laws, that it was passed by Congress. The respect due to coequal and independent departments requires the judicial department to act upon that assurance, and to accept as having passed Congress all bills authenticated in the manner stated; leaving the courts to determine, when the question properly arises, whether the act, so authenticated, is in conformity with the Constitution."

So that in *Field* v. *Clark* the question substantially as now presented — namely, as to the effect upon legislation of the failure to enter upon the journals that which is expressly required by the state constitution to be entered on them before an act can become a law — was not decided, but was in terms reserved from decision. Nothing said in that case conflicts with the judgments of the Supreme Court of North Carolina in the cases cited.

To avoid misapprehension it may be well to add that even if the decisions in North Carolina rested upon grounds inconsistent with the principles announced in *Field* v. *Clark* as applicable to the constitutional provisions relating to acts passed by Congress, it would be the duty of a Federal court to follow the rulings of the highest court of a State on the question whether a particular enactment found in the printed statutes had been passed in such a manner as to become, under its constitution, a law of the State. Whether a different principle would apply in cases where rights had accrued under a statute previously adjudged by the state court to have been so passed as to become a law, we need not now inquire.

It is, however, earnestly contended that the county cannot escape liability even if the acts of 1868, 1879 and 1881 are disregarded as not having been passed so as to become laws; that the recital in each bond that it was issued under the au-

thority of the act of 1879 does not estop the holders of bonds from showing that there was in fact ample authority to issue them, although such authority was not recited in the bonds. This contention rests mainly upon *Anderson County* v. *Beal,* 113 U. S. 227, 236, 237, 238 (1885). In that case it was said: "It is not disputed that the recital in the bond that it was issued under the act of February 26, 1866, Sess. Laws of Kansas, 1866, c. 24, p. 72, was an error. . . . It is very clear that there was legislative authority, under the act of 1869, for the issuing of the bonds in question. There was an election, and the requisite majority of those who voted assented to the proposition for the subscription to the stock and the issue of the bonds, and the subscription was made by the proper officers, and they issued the bonds. . . . The bond recites the wrong act, but if that part of the recital be rejected, there remains the statement that the bond 'is executed and issued' 'in pursuance to the vote of the electors of Anderson County of September 13, 1869.' The act of 1869 provides that when the assent of a majority of those voting at the election is given to the subscription to the stock, the county commissioners shall make the subscription, and shall pay for it, and for the stock thereby agreed to be taken, by issuing to the company the bonds of the county." To the same effect is *Knox County* v. *Ninth National Bank,* 147 U. S. 91.

The point here made is not specifically embraced in either of the certified questions, but it is so closely connected with the question whether the Circuit Court should have followed the decisions of the Supreme Court of North Carolina in *Bank* v. *Commissioners, Commissioners* v. *Snuggs, Rodman* v. *Washington, Commissioners of Wilkes County* v. *Call,* and *Commissioners* v. *Payne,* above cited, that it ought to be examined.

Of course, if there was an absolute want of power to issue the bonds in question, every purchaser of them would be charged with notice of that fact, and could not look to the county in whose name they were issued. So that the inquiry must be whether the county had power to issue the bonds without the aid of any act passed after the constitution of 1868 went into operation.

The plaintiffs insist that requisite authority was given by the Convention ordinance of March 9, 1868, and that it had been in effect so decided by the Supreme Court of the State before the bonds were issued in *Hill* v. *Commissioners*, 67 N. C. 367 (1870) and *Belo* v. *Commissioners*, 76 N. C. 489 (1877).

In *Hill* v. *Commissioners* the relief sought was an injunction to restrain the Commissioners of Forsyth County—into which the first division of the railroad was to be constructed—from imposing and collecting taxes to be applied in paying instalments due upon a subscription made by that county to the stock of the North Western North Carolina Railroad Company. The general question presented in that case, and the only one decided, was whether the legislature could constitutionally authorize a county to take stock in a railroad company under the sanction of a popular vote, and impose a tax to pay for such subscription. The Supreme Court of the State adjudged that such legislation would be legal. No reference was made to the ordinance of 1868 or to the ratifying act of August 11, 1868. Nor does it appear from the report of that case that any question was raised as to the validity of that act under the 14th section of Article 2 of the constitution of the State, nor that evidence was offered to show whether the journals of the legislature contained any entry of the yea and nay vote on the second and third readings of the bill. . Still, it must be taken that the ordinance of 1868 was assumed by the court in that case to be in force so far as Forsyth County, named in it, was concerned. The decision cannot however be regarded as authoritative upon the question whether Wilkes County had power, under that ordinance alone, to issue the bonds here involved.

In *Belo* v. *Commissioners* the relief sought was a judgment compelling the Commissioners of Forsyth County to provide for the payment of the bonds issued by them in payment of its subscription of stock to the North Western North Carolina Railroad Company. The Supreme Court of the State said: "The North Western North Carolina Railroad Company was incorporated by an ordinance of the Convention of 1868, and, by section 12 of the charter, the same power to subscribe to the capital stock of the company and subject to the like regu-

lations and restrictions is given to counties and towns as was conferred by an act incorporating the Atlantic and North Carolina Railroad Company, passed by the legislature of 1852. By section 34 of the latter act the justices of the county through or near which the road was located, 'a majority concurring,' are authorized to fix upon a subscription sum and submit it to the voters of the county. If the majority favored subscription, the justices were to choose an agent to subscribe the stock voted and to prepare and issue county bonds, as the justices should direct. The minutes of the special term of the county court of Forsyth County, which ordered the proposition to be submitted to the popular vote, recite that a majority of the justices were present, concurring in the order. The vote resulted in favor of subscription, and was so certified to the succeeding court, held in June, 1868. The minutes of that term recite that thirty-five justices were present, which number is admitted to be a majority of the whole number. At this latter term of the court the justices ordered the subscription to be made to the capital stock of the company, and the bonds to be prepared and issued and sold by the agent then chosen. The bonds were accordingly put upon the market, and among them the identical bonds now sued on were by the agent sold to one Lemly, at his banking house in Salem, on the 5th of March, 1869. These bonds recite that they were 'authorized by an ordinance of 1868, by an order of the Court of Pleas and Quarter Sessions of Forsyth County at June term, 1868, and reënacted and ratified and confirmed by an act of the General Assembly, ratified the 11th of August, 1868.' At the same term at which the subscription was made the justices assessed a special tax upon the county to meet the semi-annual interest on the bonds. This special railroad tax was annually assessed, levied and collected and applied in the discharge of the accruing interest upon the bonds from that time until 1872. A certificate for the stock subscribed was issued by the railroad company to the county, which it yet holds; an agent was annually chosen to represent and did represent the county stock in all the meetings of the company. Under the new state constitution of 1868 a Board of County Commissioners succeeded to all the powers and

duties of the justices, and up to 1872 this board unanimously caused the levy and collection of the railroad tax and its application to the discharge of the coupons due upon the bonds. But the board elected in 1872 refused to assess any further tax and to pay any further interest upon the bonds, alleging as the reason therefor that the subscription of stock so made by the county was illegal and void."

Again: "For whether conditions precedent have been complied with is a matter of fact to be determined by some tribunal invested with the power and authority to decide it, and the decision when made should be final. It is not disputed that the *power* to make the subscription of stock and issue the bonds was conferred upon the county of Forsyth *by the ordinance of the Convention.* It is equally clear that the tribunal which was authorized to issue the bonds only on compliance with conditions precedent was the sole tribunal to determine the fact whether the conditions had been fulfilled. In our case the justices of the county, a majority concurring, was the court or tribunal designated to carry the law into effect, and was the tribunal to decide whether the conditions had been complied with, and their decision is final in a suit by a *bona fide* holder of the bonds against the municipality."

After considering the rights of the parties under the Convention ordinance of 1868, the court proceeded: "So far, as to the rights of the parties under the original act of the railroad corporation, granted by the Convention of 1868. But the plaintiff further relies upon a subsequent act of the legislature, ratified the 11th of August, 1868, which confirms the original charter [ordinance] of March, 1868. This act in express terms 'ratifies all acts and things heretofore done under the provisions of said ordinance,' and confers upon the 'Board of Commissioners of the county full power and authority to levy from time to time such tax as may be sufficient to pay the subscription made by said county to the capital stock of the North Western North Carolina Railroad Company and any interest due thereon, or to liquidate any debt created by the county in borrowing money to pay such stock subscription.' The competency of the legislature to enact retrospective statutes to

validate an irregular or defective execution of power by a county corporation is well settled." The court then declared that the ratifying act of August 11, 1868, was a curative act and validated both the county subscription and the issue of the bonds, if any defects existed therein.

What was said in the *Belo* case about the validity of the act of August 11, 1868, as a curative statute, within the power of the legislature to pass, cannot be deemed as an adjudication upon the question whether that act was void upon the ground that the yeas and nays on the second and third readings of the bill were not entered on the journal. It does not appear that any such question was presented or considered, or that the journals of the legislature were in evidence or proved so that the question could have been decided.

But the *Belo* case involved other considerations. Forsyth County—whose liability on the bonds in suit in that case was directly involved—made the point that it had no authority to issue such bonds. The court however held that such authority was conferred by the Convention ordinance of March 9, 1868, and the subscription and bonds made in the name of that county to the North Western North Carolina Railroad Company were upheld as valid *under that ordinance,* which was recognized as part of the law of the State and as conferring authority on the county of Forsyth to do what it did.

It results that when the bonds here in question were issued in 1889, it was the law of North Carolina that the ordinance of 1868, constituting the charter of the North Western North Carolina Railroad Company, was not superseded by the constitution of 1868, but was *in force* and therefore gave power to counties *embraced by its provisions* to take stock in that company and pay for it in county bonds just as Forsyth County had done.

Whether Wilkes County was so situated with reference to the contemplated road that it could be said to have had the same authority as was given to Forsyth County is a question not now decided.

In this connection we must allude to what was said in *Commissioners of Wilkes County* v. *Call,* 123 N. C. 308, 317 (1898).

That was a suit brought by the Commissioners of Wilkes County against the County Treasurer to test the validity of the bonds issued in the name of that county to pay its subscription to the stock of the North Western North Carolina Railroad Company. No holder of bonds was made party to the original suit. In the progress of the case however two persons who became owners of *one* bond after the institution of the action were permitted to intervene. The Supreme Court of the State said: "We have not overlooked the fact that in *Belo* v. *Commissioners,* 76 N. C. 489, this court strongly intimates that section 12 of the charter did confer the authority given in section 33 of the act of 1852 [incorporating the Atlantic and North Carolina Railroad Company] ; but it does so incidentally and with little discussion, because it was not denied in the pleadings. This was not the determining point in the case, which turned chiefly upon the recitals in the bonds and the ratifying act of 1868. This is clearly shown in the opinion itself, which devotes four pages to the discussion of equitable estoppel arising on the recitals, and about half a page to the possible binding effect of the ordinance, winding up with the significant sentence on page 497 that 'as the case is presented to us, that question does not arise and we do *not* decide it.'" There is some ground for holding that the question which the court said was neither presented nor decided was whether the "justices could have been compelled by process of law to make the subscription, unless in defence they could have shown that the election was not fairly conducted, but was influenced by the fraud of the railroad company." Whether this be a correct interpretation of the opinion in the *Belo* case or not is immaterial; for that the ordinance of 1868 gave power to Forsyth County to make the subscription and issue bonds in payment of it was expressly affirmed in that case—indeed, it was not there disputed. So far from the *Belo* case turning, in part, upon the ratifying act of 1868, the court distinctly adjudged that the bonds were valid in the hands of *bona fide* holders under the ordinance of 1868 *without the aid of the act of August* 11, 1868.

A further reference must be made to the *Call* case. It was there said (p. 320) that "the ratification of the constitution on

the 24th day of April, 1868, when it went into effect for all domestic purposes, annulled all special powers remaining unexecuted and not granted in strict accordance with its requirements." This view was again expressed in *Commissioners* v. *Payne*, 123 N. C. 432, 486–7. By Article 7, section 7, of the state constitution, it was provided that "no county, city, town or municipal corporation shall contract any debt, pledge its faith, or loan its credit, nor shall any tax be levied or collected by any officers of the same, except for the necessary expenses thereof, *unless by a vote of a majority of the qualified voters therein.*" If the state court intended to adjudge in the *Call* and *Payne* cases that no municipal subscription to the stock of a railroad company could be made after the constitution of 1868 took effect, except in conformity to section 7, of Article 7, we perceive no reason to doubt the correctness of such interpretation of that instrument; for it could not be that any unexecuted provision of the ordinance of 1868 inconsistent with the state constitution could be executed. *Aspinwall* v. *Commissioners*, 22 How. 364; *Wadsworth* v. *Supervisors*, 102 U. S. 534, 537; *Norton* v. *Brownsville*, 129 U. S. 479, 490. But if it was intended to say that the state constitution abrogated all authority previously given to make such municipal subscriptions, and that no such subscriptions could be made except pursuant to a new statute passed in conformity with the requirements of section 14 of Article 2, we are constrained to say that such a rule could not be applied in this case so as to violate any rights which the plaintiff had under the law of North Carolina as declared by the highest court of the State before the bonds here involved were issued. It is the settled doctrine of this court "that the question arising in a suit in a Federal court of the power of a municipal corporation to make negotiable securities is to be determined by the law as judicially declared by the highest court of the State when the securities were issued, and that the rights and obligations of parties accruing under such a state of the law would not be affected by a different course of judicial decisions subsequently rendered any more than by subsequent legislation." *Loeb* v. *Trustees of Columbia Township*, 179 U. S. 472, 492, and authorities there cited.

We have referred fully to the *Hill* and *Belo* cases because of the earnest contention of learned counsel that under the law of North Carolina, as declared in those cases before the bonds in question were made, the ordinance of 1868, without the aid of subsequent legislation, gave full power to Wilkes County to issue such bonds. This view suggests various questions as to the scope and effect. of that ordinance. Assuming, as we must, that the *Belo* and *Hill* cases held that the ordinance of 1868 remained in force after the adoption of the constitution, did. the general power given by that ordinance to the North Western Railroad Company to construct a railroad from its eastern terminus, "running by way of Salem and Winston, in Forsyth County, to *some* point in the northwestern boundary line of the State, *to be hereafter determined*," invest Wilkes County with authority to subscribe to the stock of the company and to issue bonds in payment of such subscription? Was Wilkes County in the same category with Forsyth County? Was the route of the road northwest of Salem and Winston to some point in the northwestern boundary line of the State to be determined by the legislature or by the company? If by the legislature, was that route ever determined otherwise than by the act of 1879, which has been adjudged never to have become a law of the State? Did Wilkes County have authority, under the ordinance of 1868 alone, to aid, by a subscription of stock and bonds, the construction of the second division of the road referred to in the act of 1879, extending from the towns of Winston and Salem, up the valley of the Yadkin by way of Jonesville and Wilkesboro, in the county of Wilkes, to Patterson's Factory, in the county of Caldwell?

These are matters about which we do not feel disposed to express an opinion under the very general and indefinite questions certified from the Circuit Court of Appeals. Nor do we deem it proper to express any opinion as to the scope and the effect upon the rights of the parties of sections 1996, 1997, 1998 and 1999 of the Code of North Carolina. The certified questions do not directly or explicitly relate to any question arising under those sections of the Code; and it is not appropriate that this

court should, under the questions certified, consider and determine the entire merits of the case.

We answer the certified questions to this extent:

1. That the Circuit Court of the United States should have regarded the decisions of the Supreme Court of North Carolina in *Bank* v. *Commissioners, Commissioners* v. *Snuggs, Rodman* v. *Washington, Commissioners of Wilkes County* v. *Call,* and *Commissioners* v. *Payne,* above cited, as controlling upon the inquiry whether the legislative enactments of 1868, 1879 and 1881 were passed *in such manner* as to become, under the constitution, *laws* of the State.

2. That the rights of the parties in this case are determinable by the law of the State as it was declared by the state court to be at the time the bonds here involved were made in the name of the county and put upon the market.

*These answers will be certified to the Circuit Court of Appeals.*