INHABITANTS OF TOWN OF HARMONY, ME., v. TRUMAN.

(Circuit Court of Appeals, First Circuit. March 12, 1914.)

No. 1032.

1. TOWNS (§ 52*)—INCURRING INDEBTEDNESS—SUBMISSION TO VOTE.

Under Rev. St. Me. 1883, c. 51, § 138, providing that when a city or town votes at any legal meeting on the question of loaning its credit, taking stock in or aiding any person or corporation, it shall not again vote on the same subject, except at its annual meetings, a vote at a special meeting relative to issuing bonds in aid of a railroad which already had been authorized on certain conditions by a vote at a legal meeting was void, and gave no authority to issue the bonds or sell and deliver them on any terms.

[Ed. Note.—For other cases, see Towns, Cent. Dig. §§ 90–94; Dec. Dig. § 52.*]

2. MUNICIPAL CORPORATIONS (§ 943*)—BONDS—RECITAL OF COMPLIANCE WITH VOTE—EFFECT.

A recital by the selectmen of a town, in bonds issued by them in aid of a railroad that they were issued in conformity to a vote of the municipality which imposed precedent conditions, did not estop the town to deny that such conditions had been performed, unless the selectmen were vested with authority to determine the question of performance, nor unless the recital was such as would import compliance with the conditions in all substantial respects.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1972–1977; Dec. Dig. § 943.*]

3. MUNICIPAL CORPORATIONS (§ 943*)—BONDS—RECITAL OF COMPLIANCE WITH VOTE—EFFECT.

A vote of a town meeting held June 20, 1895, authorized the issuance of bonds to a proposed railroad company on condition that a guaranty should be given, to the satisfaction of a committee chosen by the town, that the balance over and above the amount of the bonds necessary for the construction and completion of the road should be subscribed and furnished and the road equipped and operated, but that if the company preferred not to give such guaranty, the selectmen might issue the bonds and take stock in the railroad upon the completion thereof, if within one year from that date. A vote passed at a special meeting held July 13, 1896, ratified and confirmed the acts of the earlier meeting, and authorized the issuance of such bonds upon receipt by the selectmen of a guaranty that the railroad would be completed and operated within six months. This vote was void because in violation of a statute prohibiting a town which had once voted on such question to again vote thereon except at an annual meeting. Without receiving any guaranty whatever the selectmen issued the bonds reciting that they were issued in conformity to the vote passed at the meeting held July 13, 1896. *Held*, that the terms of the two votes were not substantially the same, and the bonds could not be regarded as in effect reciting a compliance with the valid vote of June 20, 1895, and the town was therefore not estopped, as against bona fide purchasers, to deny compliance with the conditions imposed by that vote, since by the first vote the guaranty was to be passed upon by an independent committee, and not by the selectmen, and stock, if taken, was to be taken in a completed railroad free from debt, and with sufficient stock subscribed for to construct, equip, and operate it, and the attempted ratification of the earlier vote could not be regarded as enlarging the scope of the recital, as the purchaser could not know thereof without resort to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the town records, which would have given him notice of the earlier vote and of the invalidity of the second vote.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1972–1977; Dec. Dig. § 943.*]

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit by Nathan H. Truman against the Inhabitants of the Town of Harmony, Maine. From a decree in favor of complainant (205 Fed. 549) defendant appeals. Reversed and remanded, with directions to dismiss.

Edward F. Merrill, of Skowhegan, Me. (Merrill & Merrill, of Skowhegan, Me., on the brief), for appellant.

Sidner St. F. Thaxter, of Portland, Me. (Roscoe T. Holt and Thaxter & Holt, all of Portland, Me., on the brief), for appellee.

Before PUTNAM, DODGE and BINGHAM, Circuit Judges.

DODGE, Circuit Judge. The appellee (hereinafter called plaintiff) holds 17 bonds, each for $500, in all $8,500, purporting to have been issued by the appellant town (hereinafter called defendant) on August 1, 1896. The defendant has refused to pay either the interest or the principal, and denies their validity.

The plaintiff's bill, filed February 12, 1912, alleges that he can maintain no action at law upon the bonds, because at the date of their issue it was not in the power of the town to incur indebtedness to the amount of $8,500; that amount, together with its previous outstanding indebtedness, exceeding the limit of town indebtedness imposed by the Constitution of Maine by several thousand dollars. The relief he asks is that the bonds may be declared valid and enforced in equity to the extent of that amount for which the town could lawfully have bound itself at the time. This is the relief which the decree below purports to grant.

The plaintiff alleges that the bonds were issued pursuant to votes passed by the defendant town on June 20, 1895, May 11, 1896, and July 13, 1896. The defendant denies that the bonds were issued pursuant to the votes referred to, or either of them, and alleges that the bonds were issued notwithstanding that conditions of issue imposed by the votes had never been complied with.

1. The question thus raised is the first question to be considered. As to the terms of the votes referred to and the circumstances under which each was passed there is no controversy. They were as follows:

The vote of June 20, 1895, was passed at a lawful special meeting, and was, in substance:

To raise $8,500 to aid in the construction of a railroad from Hartland to Harmony village;

To authorize the selectmen to contract that said railroad should be built;

To subscribe for stock in the railroad company as soon as it should be organized;

To issue bonds of the town to the railroad company for $8,500 at such time and rate of interest as the selectmen should deem advisable;

"On these conditions":

That the party with whom the selectmen should contract—

"give a guaranty to the satisfaction of a committee to be chosen by said town, that the balance of the money over and above ($8,500) necessary for the construction and completion of said road and appurtenances to said Harmony village shall be subscribed and furnished, said road equipped and operated. If, however, said railroad company prefer they need not give any guaranty to build said railroad. But the selectmen may issue said bonds and take stock in said railroad as above upon the completion of said road to Harmony village if within one year from date of this meeting."

Immediately after the vote a committee of four was chosen to act with the selectmen.

That the contemplated railroad company was afterward organized under the name of Sebasticook & Moosehead Railroad Company seems to be assumed by both parties, but the record does not show the date of its organization. By a stipulation in the record, however, filed May 8, 1913, it appears that this railroad company recorded a trust mortgage, dated October 1, 1895, for $250,000, to secure bondholders. The record does not show that the selectmen ever subscribed for any stock in the road, although, as hereinafter stated, a certificate of stock was later delivered to them.

May 11, 1896, at another special meeting, the town passed a vote by a majority of 81 to 45, to—

"change the contract as entered into with the S. & M. R. R. Co. by the selectmen of Harmony, by extending the time from June 20, 1896, to August 20, 1896."

The record nowhere shows what this contract was, nor does it even show affirmatively any contract made at any time between the selectmen and the railroad company; but that there was some such contract seems to be assumed. This meeting and vote, however, are of no consequence, because, as the plaintiff's brief states and the District Court has found, the vote was not passed by the two-thirds majority required by statute. Neither party has relied upon it as in any way material for the purposes of the case.

The vote of July 13, 1896, was passed at a special meeting and purported to be, in substance, as follows:

That all the acts and doings of the meeting of June 20, 1895, whereby said town voted to aid the Sebasticook & Moosehead Railroad Company and to issue the bonds of the town for such purpose to the amount of $8,500, "also to see if the town will ratify the doings of a special meeting of said town held May 11, 1896, for the purpose of extending the time within which said railroad should be built is hereby ratified and confirmed.

"And said town is hereby authorized to subscribe for and receive stock of said railroad company to the amount of [$8,500].

"And the sum of [$8,500] is hereby voted to said railroad company for the said stock and for the building and completion of said railroad to Harmony village.

"And the selectmen and treasurer of said town are hereby authorized to issue the bonds of the town to such an amount at a rate of interest not exceeding four per cent. per annum in such denominations time and form as they may deem to the advantage of said town and hereby authorize to sell and deliver said bonds for the purpose of aiding said (S. & M. R. R. Co.).

"And the selectmen are hereby authorized, upon receiving a sufficient guaranty that the railroad will be completed and operated to Harmony village within six months from date to deliver said bonds or the proceeds thereof

as they may deem expedient to said railroad company upon receiving such guaranty."

[1] At this meeting of July 13, 1896, however, the town was wholly without power to pass the above or any vote relating to the subject. Having voted at its legal meeting of June 20, 1895, "upon a question of loaning its credit, or taking stock in, or in any way aiding" a corporation, it was forbidden by the express terms of a Maine statute (1883, c. 51, § 138), to vote again upon the same subject except at an annual meeting, which the meeting of July 13, 1896, was not. The vote, therefore, being in direct violation of the statute, was wholly null and void. It had no effect either to ratify the vote of June 20, 1895, or to authorize a subscription by the town for stock in the railroad, or to appropriate $8,500, either for buying the stock or for building the road. Nor did it give the town officers any authority to issue any bonds, or to sell and deliver any for the purpose of aiding the railroad, or to deliver any to the railroad company, whether upon receiving the guaranty provided for, or upon any other terms.

The selectmen and treasurer proceeded nevertheless, on August 1, 1896, to sign and issue 17 ten-year, 4 per cent. bonds, each for $500, purporting to be bonds of the town. In each was their recital that the bond was one of the series described, and was—

"issued for the purpose of aiding the Sebasticook & Moosehead Railroad Company and in conformity to the vote of said town passed at a special meeting, held July 13, 1896, which vote is recorded in the town records of said town of Harmony."

All the bonds thus issued were immediately delivered together, by the selectmen, to officials of the railroad company, but without receiving any guaranty whatever, from the railroad or from any one else. These were the bonds now held by the plaintiff, who took them in the following November as security for a loan; and, by the failure of the borrower to pay, he has since become the owner of them. Except by the recital in the bonds, the evidence does not charge him with knowledge of any irregularities attending their issue, and he stands as a bona fide purchaser.

It is to be noticed that the issuance and delivery of the bonds without guaranty was no less in violation of the requirements imposed by the valid vote passed June 20, 1895, than of the requirements of the void vote on July 13, 1896, according to which they purported to have been issued. The valid vote required, not merely a sufficient guaranty that the road should be completed and operated within six months, but a guaranty that the necessary money in excess of $8,500 had been actually subscribed and furnished for its completion; and the sufficiency of that guaranty was not left to the selectmen, but was to be passed on by the committee chosen for the purpose. Or if a guaranty were dispensed with, and the bonds issued for stock in the railroad company without guaranty, this was only to be done upon the actual completion of the road within one year from June 20, 1895. The selectmen, as is assumed, received stock in the railroad company to the par value of $8,500 when they issued the bonds as above on August 1, 1896; but the road had not then been completed, nor was it ever com-

pleted by that company, which discontinued all work upon it soon afterward. Creditors attached the company's property, its equity therein was levied upon, and the mortgage it had given was foreclosed. The town offers in its answer, filed September 2, 1912, to return the $8,500 of stock, alleging it to be worthless; and, of course, on that date it was worthless.

We agree with the learned Judge of the District Court that if the bonds had been in fact issued in conformity with the terms of the vote of June 20, 1895, they could not be held void merely because they recited the void vote of July 13, 1896, as the authority for their issue. Wilkes Co. v. Coler, 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642; s. c., 190 U. S. 107, 23 Sup. Ct. 738, 47 L. Ed. 971.

The vote of June 20, 1895, having been the only lawful vote ever passed by the town relating to an issue of its bonds in aid of this railroad, the question is how far the selectmen's recital in the bonds issued concludes the town in the plaintiff's favor on the question of compliance or noncompliance with the conditions which that vote imposed upon the contemplated issue.

[2] The general result of the decisions of the Supreme Court cited in his opinion by the learned Judge of the District Court, the earliest being Coloma v. Eaves, 92 U. S. 484, 23 L. Ed. 579, and the latest Evansville v. Dennett, 161 U. S. 434, 16 Sup. Ct. 613, 40 L. Ed. 760, is, as his opinion states, that:

"Where a statute confers power upon a municipal corporation, upon performance of certain precedent conditions, to execute bonds in aid of the construction of a railroad, * * * and imposes upon certain officers * * * the responsibility of issuing such bonds when certain conditions have been complied with, recitals by such officers that the bonds have been issued in conformity with the statute have been held, in favor of bona fide purchasers for value, to import full compliance with the statute and to preclude inquiry as to whether the precedent conditions had been performed before the bonds were issued."

The same principles no doubt govern when the question is not as to conformity with a statute, but as to conformity with a vote of the municipality imposing precedent conditions. But in order to enable a bona fide purchaser to invoke them, it must appear that the officers upon whose recital he relies were the officers having authority to determine whether the conditions covered by their recital had been performed or not, and their recital must also have been such as would import compliance with the conditions in all substantial respects. In School District v. Stone, 106 U. S. 183, at page 187, 1 Sup. Ct. 84, at page 87 (27 L. Ed. 90), one of the decisions relied on as above by the District Court, it is said, after stating the above general rule:

"But in all such cases, as a careful examination will show, the recitals fairly imported a compliance, in all substantial respects, with the statute giving authority to issue the bonds. We are unwilling to enlarge or extend the rule, now established by numerous decisions. Sound public policy forbids it. Where the holder relies for protection upon mere recitals, they should, at least, be clear and unambiguous, in order to estop the municipal corporation, in whose name such bonds have been made, from showing that they were issued in violation, or without authority, of law."

The selectmen's recital in these bonds, therefore, can conclude the town in the plaintiff's favor only so far as the selectmen were the officers vested with authority to determine whether the conditions of the vote of June 20, 1895, had been satisfied or not, and as to those conditions regarding which they were vested with such authority only so far as the terms of the recital in the bonds import compliance with them.

[3] If this recital had been that the issue was in conformity with the lawful vote of June 20, 1895, it might perhaps have been true, that vote being valid and unrevoked, that compliance with its conditions was sufficiently recited.

Instead of reciting that the bonds were issued in conformity with the lawful vote of June 20, 1895, the recital was only that they were in conformity with the unlawful vote of July 13, 1896, with a reference to that vote as it appeared on the town records; and the question is whether this can be regarded as importing compliance, in all substantial respects, with the earlier lawful vote.

We are unable to agree with the learned Judge of the District Court that the terms of the invalid vote were substantially the same as the terms of the valid one, and that the bonds may, for that reason, be regarded as substantially reciting a compliance with the provisions of the vote of June 20, 1895. As has appeared, they differed in respects which we cannot regard as immaterial. By the former vote any guaranty was to be passed upon by the independent committee, whereas, according to the latter illegal vote, it was to be passed on by the selectmen alone. The former vote, if stock was to be taken, required stock in a completed railroad, free from debt, and, having sufficient stock subscribed for, to construct, equip, and operate it. The latter illegal vote, omitting these material and vital requirements, purported to authorize the issue of the bonds for the stock and for the building and completion of an uncompleted railroad; that is, upon conditions whereby the town's interests were by no means so carefully protected as they had been in the lawful vote. Although the unlawful vote purported to ratify and confirm the lawful one, it was inconsistent with the lawful vote in respect of the conditions imposed. Neither because of the attempted ratification, which was void, nor because of any supposed conformity between the two votes, can we hold that reciting the unlawful vote of July 13, 1896, fairly imported substantial compliance with the vote of June 20, 1895.

The vote of June 20, 1895, was neither mentioned nor expressly referred to in the recital, and it is only through reference to the town records and to the unlawful vote of July 13, 1896, as it there appears, that it can be brought in so as in any way to support or aid the recital. The recital expressly describes the vote of July 13, 1896, as passed at a special meeting, and refers to the town records for its terms. As it appeared on those records, it showed, by the attempted ratification contained in it, that the town had already voted upon the question involved, could not therefore lawfully vote upon it again at any special meeting, and thus that the recited vote was unlawful. We are unable to believe that a recital by town officers, which thus afforded a pur-

chaser the means of knowledge that the vote recited as authority for their issue was void and of no effect, can estop the town from asserting that fact, or any fact disclosed by the record of the vote so recited as authority, showing noncompliance with conditions which the town had in fact prescribed.

The plaintiff, when he acquired these bonds, had the means of knowledge from them, and the town records referred to in them, that the conditions of the recited vote were inconsistent with those imposed by the vote of June 20, 1895, and also that the ratification attempted by the recited vote could not operate as a ratification. He has to rely upon the recited illegal vote if he seeks, by means of the ratification attempted in it, to extend and enlarge the scope of the recital in the bonds so as to include any of the terms of the earlier vote. Without examination of the illegal vote, he could not have known that it had attempted any ratification, and examination would have shown him, either that it was void, and therefore no ratification, or that, if valid, it repealed instead of ratifying the conditions of the former vote.

We are unable to hold that the plaintiff, in taking the bonds, had the right to assume, either from the recital they contained or from the purported vote therein mentioned, that they had been issued in conformity with the only lawful vote of the town upon the subject, so as to preclude the town from showing that in fact there had never been any such compliance. A presumption in his favor, as a bona fide purchaser, that he took the bonds without notice of any circumstances impeaching their validity may be conceded. But, on the facts which appear, we think the town may and does overcome that presumption.

2. Unless the plaintiff has the right to treat the bonds as lawfully authorized except so far as their amount is concerned, the relief sought in his bill cannot be granted.

Whether or not, if he had that right, the bonds could be adjudged valid and enforced for that proportion of their total amount, with interest, for which the town might lawfully have bound itself at the time, is a question which would have to be answered in the negative if, as in Hedges v. Dixon County, 150 U. S. 182, 14 Sup. Ct. 71, 37 L. Ed. 1044, the appropriation made and the issue of bonds to the amount appropriated must be regarded as one indivisible transaction.

In that case the county had voted to issue its bonds to the amount of $87,000 as a donation to a railroad company, without any consideration whatever to the county, whether in the shape of stock or otherwise. The county was at the time allowed by the state Constitution to issue bonds for such a purpose, only to the amount of 10 per cent. of its assessed valuation—an amount much less than $87,000—and the bonds were void at law for that reason. It was held that what the county authorized and carried into execution was one entire transaction; that to reform it so as to curtail the entire issue to such an amount as was within the constitutional limit would involve the making of a different donation from what the county voted and intended to make, and that there was no jurisdiction in equity so to modify it.

In the present case the issue of bonds was neither intended nor voted as a donation; the bonds, whether duly guaranteed or issued upon

completion of the road, were to be issued in exchange for an equivalent amount of stock; and the town got stock to the amount contemplated by the vote, though not in a completed railroad or a road having money enough subscribed for its completion. This stock, it is true, afterward turned out to be worthless; but there is nothing in the record which proves that it was absolutely without value when the town took it, or that it was then so regarded by the parties. The bonds, though issued together, bore successive numbers from 1 to 17, inclusive.

If, in view of all these facts, the transaction need not necessarily be regarded as so far entire and indivisible that to adjudge the bonds valid in a proportion of their amount, as prayed for, would be to make for the parties a contract wholly different from that which the town intended and voted, there is authority, not to be lightly disregarded, for saying that the relief which the plaintiff asks might be granted. Dillon, Municipal Corporations (5th Ed.) § 203, and cases cited. The learned Judge of the District Court regarded the case, in this aspect, as not within the decision in Hedges v. Dixon County, and granted the relief. The view we have taken of the case renders it unnecessary for us to determine whether or not his decree might have been upheld had we been able to agree with him in holding the issue of the bonds valid for any purpose in the plaintiff's favor.

The decree of the District Court is reversed, and the case is remanded to that court, with directions to dismiss the bill; and the appellant recovers its costs in both courts.

BINGHAM, Circuit Judge (concurring). This is an appeal from an order of the District Court for the District of Maine, overruling the defendant's demurrer, and from a final decree in favor of the plaintiff, in an equity proceeding brought by Nathan H. Truman against the town of Harmony, in which he asks that certain bonds of the town be declared good and valid after reducing their amount to the limit the town was authorized to issue, and for the payment of certain overdue coupons after scaling them down to correspond with the reduced value of each bond.

It appears that the town on June 20, 1895, voted an appropriation of $8,500 to aid in the construction of a railroad from Hartland to Harmony village, in said Harmony, and authorized its selectmen to enter into a contract with any party that the road should be built, and to subscribe for stock in the road to that amount as soon as the railroad company should be organized, and that at the same time it voted to issue bonds of the town to the railroad company for said amount, upon certain specified conditions, to meet the subscription.

August 1, 1896, bonds to the amount of $8,500, and in the sum of $500 each, were issued and delivered by the selectmen of the town to the officers of the Sebasticook & Moosehead Railway Company in exchange for stock of like amount in that railroad. At that time the outstanding indebtedness of the town was such that its authority under the Constitution of the state to increase its indebtedness was limited to $3,654.41. The bonds were sold by the railroad, and the plaintiff subsequently became the holder of them.

These facts clearly demonstrate that the appropriation of $8,500, and the issuance of the bonds for that amount to meet the appropriation, was one entire and indivisible transaction, and that no particular number of the bonds can be separated from the others and held to be valid as within the constitutional limit of the town to issue. The facts here presented are not the same as those in Daviess County v. Dickinson, 117 U. S. 657, 6 Sup. Ct. 897, 29 L. Ed. 1026, and do not authorize the conclusion there reached upon this question. That the facts here presented warrant the conclusion that the bonds were issued as an entirety, is, for all practical purposes, conceded by the plaintiff. His bill proceeds upon the theory that the vote and issue of bonds was one entire transaction; that as the transaction called for an issue in excess of the constitutional power of the town to authorize, all of the bonds were illegal and unenforceable at law, and that because of their non-enforceability as legal obligations the plaintiff should be permitted to come into equity and have the amount of the excess ascertained, the bonds scaled down to the constitutional limit, and when scaled down, declared good and valid. Furthermore, it appears from the decree that this was the course pursued at the trial. In the decree it is stated:

"That on the 1st day of August, 1896, said respondent, in addition to the indebtedness then outstanding against it, had the legal power to create an enforceable indebtedness to the amount of $3,654.41, and that the said issue of bonds of August 1, 1896, was valid to the extent of said sum of $3,654.41, and that each of said bonds was partially valid and partially invalid, that is to say, each of said bonds was valid in the sum which bears that proportion to $500 that $3,654.41 bears to $8,500, to wit, .42993 per cent.; that upon each of said bonds numbered from 1 to 17, inclusive, the said respondent, at the time of issuance and delivery thereof, became bound to pay to the owner and holder thereof the sum of $214.965, instead of $500, as denominated in each of the said bonds."

And, inasmuch as none of the bonds were due at the time of the bringing of the suit, and would not become due until the 1st of August, 1916, it was further ordered and decreed—

"that the respondent shall pay the holder or holders of the said several bonds at the maturity thereof the said sum or sums of money for which the same are hereby adjudged valid, and that the said town shall pay interest upon the valid portion of each of said bonds semiannually until their maturity, at the rate of 4 per cent. per annum, according to the terms and provisions of the said bonds and the coupons thereto attached, commencing with the coupon due August 1, 1913, save and except that the interest coupons shall be reduced so as to evidence seminannual interest upon the sum of $214.965, instead of $500; so that each coupon shall represent interest in the sum of $4.299, and the said bonds shall be held and considered in all respects as negotiable bonds as fully as though the said recital had not been written or stamped thereon."

And as to the interest coupons that were due, and which had not been paid, it was decreed that "the plaintiff shall recover judgment against the respondent in the sum of $1,023.23."

1. The first question, therefore, presented by the case is whether the plaintiff, as the owner of the entire series of bonds issued by the town in excess of the limit fixed by the Constitution of the state, and which for that reason are not enforceable at law, can invoke the aid of a court of equity to afford him relief by first ascertaining the amount of

bonds which the town could lawfully have issued, and then, having scaled down the issue to the limit thus ascertained, declare such excess to be void, and the residue good and valid, and enforce payment of the interest on the residue against the town.

In Hedges v. Dixon County (C. C.) 37 Fed. 304, on appeal 150 U. S. 182, 14 Sup. Ct. 71, 37 L. Ed. 1044, this very question was presented and decided. In that case the plaintiffs were holders of nearly the entire issue of $87,000 in bonds of the county of Dixon, in the state of Nebraska, which the county had issued and donated to the Covington, Columbus & Black Hills Railroad Company, pursuant to a vote of the electors of the county. In that case, as in this, when the interest coupons matured, payment was refused by the county officials, on the ground that the bonds were invalid because they exceeded in amount 10 per cent. of the assessed valuation of the taxable property of the county at the time of their issue. And the plaintiffs brought their bill, offering to surrender and cancel so much of their bonds as exceeded 10 per cent. of the assessed value of the taxable property of the county; each holder surrendering his proportionate share of such excess.

That case, when it was before the Circuit Court (37 Fed. 304), was decided by Mr. Justice Brewer, then Circuit Judge in the Eighth Circuit, who, in considering this question said:

"Conceding that the bonds, as they stand, are void, and that no recovery can be had thereon in a court of law, complainants insist that a court of equity has power to scale them down to an amount equal to that that the county might lawfully have issued, and enforce them when thus scaled down. It is said that the vice of this transaction is only in the matter of excess; that a court of equity may expunge the vice, and enforce the contract thus freed from taint. Counsel for complainants concedes that he has been unable to find any precedent for such a proceeding, and his confession of inability is satisfactory evidence that no such precedent exists, so that the question must be determined by reference to the general principles of law; and here it may be remarked that the difference between courts of law and those of equity is mainly one of forms and remedies, rather than in the matter of absolute rights and obligations. If a contract be pronounced absolutely void in a court of law, it must expect the same denunciation in a court of equity. Courts of equity, like those of law, must accept contracts as they are made, and have no power to make contracts for parties. If the contracts which parties attempt to make are void because in defiance of some statute or common law, they are void alike in either court, and neither court can change a void into a valid contract. Now, the contract in this case, in its inception, was on the part of the county a single and indivisible obligation; that is, an attempted donation of $87,000 to the railroad company. The bonds are merely evidences of the contract, the contract standing behind them, and, whatever separate and divisible obligations of the county exist after the issue of the bonds, the contract in the first instance was single and entire. Now that was an attempted donation of $87,000 to the railroad company. Such donation the county had no power to make, and, after it had finished its action, nothing which the promisee, the other party to the contract, could do could give validity to the obligation of the county. It was either good or bad, dead or alive, when it left the hands of the promisor. Take this illustration: If, in a state where usury avoids the entire contract, a usurious note be given, that note is void, and no willingness of the payee, no act of his, can transform that invalid into a valid contract. Of course it would be very satisfactory if the promisee, by consenting to a reduction of the interest, could give validity to a void promise, vitality to a dead contract. So here, if the promisee, the railroad company, could reduce

the extent of the promise, it doubtless would be satisfactory, but it would be thereby making a contract, or attempting to make a contract, different from that which the promisor proposed. The fact that 87 bonds were issued, instead of one, in no manner changes the primary obligation attempted to be assumed by the county."

And further on he says:

"This court can make no contract for the parties. It must take the contract which they made. That contract was one that the county was not authorized to make. The bonds were void as adjudged in a court of law, void in whole and in part, and they must be so adjudged in a court of equity; and, the county having received nothing of value, no equitable obligation can be enforced against it."

In the Supreme Court (150 U. S. 182, 14 Sup. Ct. 71, 37 L. Ed. 1044), Mr. Justice Jackson, in delivering the opinion of the court, in the same case, at the bottom of page 188 of 150 U. S., at page 73 of 14 Sup. Ct. (37 L. Ed. 1044), says:

"What the county authorized and carried into execution in the present case, both by the vote and by the donation, was one entire transaction, and if it should be so reformed as to curtail the entire issue of bonds to such an amount as was within the constitutional limits of the county to donate, it would be something different from that which was voted by the county, and carried into effect by the issue of the bonds. This would involve the making of a different donation from what the county voted and intended to make to the railroad company."

Having decided that the donated bonds were issued as one transaction, and that the issue, if regarded purely as a donation, could not be reformed by reducing the amount of the issue, he proceeds to consider what would have been the situation if the transaction constituted a contract between the railroad company and the county. As to this, he says:

"It is urged that the vote and the issue of the bonds constituted a contract between the railroad company and the county, and that the bonds issued in pursuance thereof should be scaled, as sought by the bill, to bring the contract within the authority of the county; that as the county intended to make a valid donation, such reduction of the amount of the issue, which the complainants offer to make, should be sanctioned by the court, and the residue declared valid. But the difficulty in the way of this suggestion is that, treating the transaction as a contract, it is not within the power of a court of equity to change its terms and provisions. Besides, it is not shown that the county would have voted a different amount from what was issued, or that it intended to issue a less amount. It is too well settled to need citation of authorities that a court of equity, in the absence of fraud, accident, or mistake, cannot change the terms of a contract."

Then, again, on page 192 of 150 U. S., at page 74 of 14 Sup. Ct. (37 L. Ed. 1044) he says:

"The fact that the complainants have no remedy at law, arising from the invalidity of the bonds, confers no jurisdiction upon a court of equity to afford them relief. The established rule, although not of universal application, is that equity follows the law, or, as stated in Magniac v. Thomson, 56 U. S. (15 How.) 299 [14 L. Ed. 696] 'that wherever the rights or the situation of parties are clearly defined and established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maximum equitas sequitur legem is strictly applicable.' Where a contract is void at law for want of power to make it, a court of equity has no jurisdiction to enforce such contract, or, in the absence of fraud, accident, or mistake, to so modify it as to make it legal and then enforce it. Courts of

equity can no more disregard statutory and constitutional requirements and provisions than can courts of law. They are bound by positive provisions of a statue equally with courts of law, and where the transaction, or the contract, is declared void because not in compliance with express statutory or constitutional provisions, a court of equity cannot interpose to give validity to such transaction or contract, or any part thereof."

This was not the only question considered in that case. The complainants also sought to sustain their right of recovery upon the ground that the county had received a benefit from the construction of the railroad which the bonds were issued to promote, that this benefit was the equivalent of the face of the bonds, and for the payment of which a contract should be implied in law.

After discussing the cases where recovery was allowed upon its appearing that the municipality had received full pecuniary consideration for its invalid bonds, and had applied the proceeds to the purpose for which the bonds were issued, and after pointing out that those cases differed from the one the court was considering in that the county of Dixon received no money for the bonds, the court said:

"The circumstances and conditions which gave the holders of the bonds an equitable right in those cases to recover from the municipality the money which the bonds represented do not exist in the case under consideration, where the county received no part of the proceeds of the bonds, and no direct money benefit, but merely derived an incidental advantage arising from the construction of the railroad, upon which advantage it would be impossible for the court to place a pecuniary estimate, or to say that it would be equal to such portion of the bonds in question as the county could lawfully have issued. * * * If any equitable claim arises in favor of the holders of the bonds it must be against the railroad company, from whom the bonds were purchased, and by whom their payment was guaranteed, as that company was the recipient of the legal consideration realized upon the negotiation of the bonds."

The decision in Hedges v. Dixon County is controlling upon the proposition that this court, as a court of equity, is without authority to scale down the bonds, as was done by the District Court in the decree above set forth; that it is for the parties to make their own contracts, and for the court to enforce them as made if they are legal; that the power of the court to reform contracts is limited to cases where it appears that through fraud, accident, or mistake, some provision was inserted in the contract that did not express the intention of the parties.

In all the cases to which our attention has been called, recognizing the claim of the plaintiff to have the bonds scaled down to the constitutional limit—with the exception of the case of City of Columbus v. Woonsocket Institution of Savings, 114 Fed. 162, 52 C. C. A. 118, hereafter considered—it appeared that the municipality sought to be charged had received from the sale of its bonds a money consideration equal to or greater than the reduced value of the bonds. While the result reached in those cases was right, the method by which it was reached was clearly wrong. It is a well-recognized principle that, under such a state of facts, the law will imply a contract to repay the purchaser of the bonds the money received by the municipality therefor, to the extent that the municipality had constitutional and statutory authority to borrow the money, but that above that limit no con-

tract will be implied. Chelsea Savings Bank v. City of Ironwood, 130 Fed. (C. C. A., Sixth Circuit) 410, 412, 66 C. C. A. 230; Louisiana v. Wood, 102 U. S. 294; 26 L. Ed. 153; Litchfield v. Ballou, 114 U. S. 190, 5 Sup. Ct. 820, 29 L. Ed. 132; Parkersburg v. Brown, 106 U. S. 487, 1 Sup. Ct. 442, 27 L. Ed. 238; Gause v. Clarksville, 10 Fed. Cases, No. 5,276, at page 102.

The case of City of Columbus v. Woonsocket Institute of Savings, 114 Fed. 162, 52 C. C. A. 118, upon which the plaintiff chiefly relies in support of its contention as to scaling down the bonds, was an action at law. The bonds there in question had been issued as an entirety. Their amount exceeded the constitutional limit which the city was authorized to issue. The plaintiff sought to recover the interest that was due on the entire issue and the principal on that half of the bonds which were then due. In the Circuit Court judgment was entered for the plaintiff for the interest on all the bonds, and for the principal on those that were due, and the city appealed. In the Court of Appeals the judgment of the Circuit Court was reversed, for the reason that the bonds, having been issued as an entirety and in excess of the constitutional limit, were illegal. Judgment, however, was entered for the appellees. This was done by scaling down all the bonds to the amount which the city was authorized to issue, and by reducing the interest on each coupon to correspond with the reduction in the amount of each bond. If an opinion was written in the Circuit Court, it does not seem to have been reported, and the case as reported on appeal does not disclose whether the city received a money consideration for the bonds or not. If it did not, the conclusion reached was erroneous, as well as the method by which it was reached, and was in direct conflict with the decision of the Supreme Court in Hedges v. Dixon County. The Hedges Case is not alluded to in the opinion, and apparently was not called to the court's attention. Furthermore, the opinion apparently ignores all the fundamental principles of law and equity, and is of little value as a precedent.

2. Is the plaintiff entitled to recover on the theory of a contract implied in law? As to this, it may be said that the plaintiff introduced no evidence that the stock received by the town for the bonds was of any value. The evidence of the defendant was that it was of no value, and in its answer it offers to return the stock to the plaintiff. The District Court ruled that it was immaterial what the value of the stock was, declined to consider the evidence on that question, and the defendant excepted. Whether the stock was of any value was material upon the question whether a contract could be implied in law. In the absence of such proof the law will not imply a contract in favor of the plaintiff, or of the railroad company from which the plaintiff received the stock. Travelers' Ins. Co. v. Mayor of Johnson City, 99 Fed. (Cir. Ct. App., Sixth Circuit) 663, 40 C. C. A. 58, 49 L. R. A. 123; Chelsea Sav. Bank v. City of Ironwood, supra.

The principle underlying contracts implied in law is restitution, that is, that the defendant has in his hands something of value which, in justice and equity, belongs to the plaintiff, and should be restored to him; but, as a court of law cannot order the return of the specific

thing, because of its lack of power to do so, it orders its value to be restored. Keener on Quasi Contracts, p. 286. This, however, being a proceeding in equity, we are not hampered as to the method by which restitution may be made. If the stock is returned to the plaintiff, it is apparent that he will receive everything of value that came into the defendant's hands by reason of the transaction. Chapman v. County of Douglas, 107 U. S. 348, 355, 356, 2 Sup. Ct. 62, 27 L. Ed. 378. The sum received by the railroad in the sale of the bonds did not come to the defendant; the railroad in making the sale was not acting in the defendant's behalf, but for itself. See Travelers' Ins. Co. v. Mayor of Johnson City, 99 Fed. (Cir. Ct. App., Sixth Circuit) 663, 666, 670, 40 C. C. A. 58, 49 L. R. A. 123.

3. If the bonds in question had not exceeded the constitutional limit which the town was authorized to issue, and were not for that reason invalid, or if the transaction was not entire, and their delivery was such that priority could have been given to those issued within the constitutional limit, there is still another reason why the plaintiff could not recover upon the bonds, if they were due, either in an action at law or in equity.

On the face of the bonds it is stated that they were issued in pursuance of a vote of the town passed at a meeting held July 13, 1896. The action of the town taken at that meeting was void and of no effect, as it was a special meeting, and the question of the town's "loaning its credit to the taking of stock" in the railroad had been previously voted upon at a "regular meeting," held June 20, 1895.

In the Revised Statutes of Maine, 1883 (chapter 51, § 138) it is provided that:

"Whenever a city or town has voted at any regular meeting thereof upon any question of loaning its credit to, the taking of stock in, or in any way in aiding any person or corporation, said city or town shall not vote again upon the same subject, except at its annual meeting."

The plaintiff recognizes that the bonds are in no sense legal obligations of the town, if the only authority for their issuance is that contained in the vote of July 13, 1896. But he says that adequate authority for issuing the bonds is to be found in the vote of June 20, 1895.

An examination of the vote of June 20, 1895, discloses that the authority there conferred upon the selectmen to issue and deliver bonds to the railroad company was upon the express condition that the party with whom the selectmen entered into the contract to subscribe for stock in the railroad should give a—

"guaranty to the satisfaction of a committee to be chosen by said town. that the balance of the money over and above ($8,500) eight thousand five hundred dollars, necessary for the construction and completion of said road and appurtenances to said Harmony village, shall be subscribed and furnished, said road equipped and operated."

At the meeting of June 20 1895 the town chose a committee of seven who were to decide whether the guaranty that was to be furnished complied with the conditions of the vote, and was to their satisfaction.

The defendant contends that the conditions of this vote were never complied with. The plaintiff's answer is that the recital in the bonds that they were issued in conformity to the vote of the town of July 13, 1896, estops the town from showing that the bonds were not issued in compliance with the conditions of the vote of June 20, 1895. If the conditions specified in the two votes were the same, no doubt there might be something in this contention, but they are not the same. Under the vote of June 20, 1895, one of the conditions was that the guaranty was to be passed upon by the committee consisting of seven members, whereas under the vote of July 13, 1896, it was to be passed upon by the selectmen alone. Then, again, under the vote of June 20, 1895, the condition looked to an issue of stock to be taken in a railroad which was to be completed, free from debt, and a subscription of stock was to be had sufficient to construct, equip, and operate it. This was a material and vital condition precedent to the issuance of the bonds. Nothing of the kind was contained in the vote of July 13, 1896, as a condition, or otherwise, to the bonds being issued.

The conditions in the two votes not being the same, it remains for us to consider whether there was anything in the recital in the bonds upon which the plaintiff could fairly rely as a representation on the part of the town that the conditions of the vote of June 20, 1895, had been complied with, so as to estop the town from showing that it had not been; for unless the recital contained such a representation, there can be no estoppel. There surely is nothing in the recital from which the plaintiff could fairly infer that the bonds were issued in pursuance of the vote of June 20th, or in conformity with the conditions of that vote. But the plaintiff seeks to extend and enlarge the meaning of the recital in the bonds by a statement in the vote of July 13, 1896, wherein it was attempted to ratify the vote of June 20, 1895. It is to be borne in mind that the vote of July 13, 1896, through which the plaintiff seeks to extend the scope of the recital, was illegal and void, and it is inconceivable how the recital in the bonds can be extended and enlarged through such a medium. The vote of July 13, 1896, to have been of any force and effect, must have been a legal vote, and, if a legal vote, its conditions being different from those contained in the vote of June 20, 1895, it would, to that extent at least, operate as a repeal, and not as a ratification of the conditions of the vote of June 20, 1895.

Furthermore, if the plaintiff, or the officials of the railroad, had examined the vote of July 13th, they would have ascertained that its conditions were different from those contained in the vote of June 20th, and inconsistent therewith; and, this being so, that the ratification would operate to confirm the vote of June 20th to the extent that it authorized the appropriation of $8,500, and not to the extent that it imposed conditions under which the bonds were to be issued. And, if they had discovered that the vote of July 13th was illegal and void, they would have known that the attempted ratification was no ratification at all. Without examining the vote of July 13th, they would not have known of the attempted ratification by which they seek to extend and enlarge the scope of the recital in the bonds; and, if they had examined it, they would either have learned that the vote was void, and

would not operate to ratify the former vote, or that it was valid, and had the effect to repeal the conditions of the vote of June 20th instead of ratifying them. In any view, the vote of July 13th does not enlarge the recital in the bonds so as to operate as a representation on the part of the town that the conditions of the vote of June 20th were complied with.

Then, again, under the vote of June 20th, the body authorized on behalf of the town to determine whether the conditions of that vote had been complied with was a committee of seven, and it was this committee, and this alone, that could be said to be authorized to make a certificate upon the bonds that they were issued, in conformity with the vote of June 20th, so as to work an estoppel. In Dixon County v. Field, 111 U. S. 83, at page 94, 4 Sup. Ct. 315, at page 320 (28 L. Ed. 360), it was held that:

"If the officers authorized to issue bonds, upon a condition, are not the appointed tribunal to decide the fact, which constitutes the condition, their recital will not be accepted as a substitute for proof."

For these reasons I concur in the result reached in this case.