### HILL et al. v. ELIZABETH CITY et al.

(District Court, E. D. North Carolina.   June 20, 1923.)

No. 110.

1. **Municipal corporations ⚖️682(3)—Acceptance of service of public service corporation after expiration of contract held not to operate as renewal.**

   Continued service by public service corporations to a city after expiration of contracts between them and acceptance and payment for such service does not operate as a renewal of the contracts, but creates a relation which may be terminated by either party on reasonable notice.

2. **Injunction ⚖️114(2)—Bondholders may maintain suit to restrain violation of rights of public service corporation.**

   Bondholders of a public service corporation may maintain a suit to enjoin acts of a municipal corporation which it is alleged will operate to deprive the company of its property in violation of its constitutional rights.

3. **Constitutional law ⚖️134—Municipal corporations ⚖️685—Issuance of bonds for construction of water, light, and sewage systems held not in violation of rights of companies operating under nonexclusive franchises.**

   The issuance of bonds by a city for the construction of water, light and power, and sewerage systems *held* not to deprive companies operating such systems under franchises not by their terms exclusive of their property in violation of their constitutional rights not to impair their contract rights under contracts with the city for definite terms which had expired.

4. **Municipal corporations ⚖️684—Franchises to public service corporations to be strictly construed.**

   Franchises granted to public service corporations are to be construed strictly in favor of the public, and no exclusive grant may be read into them by implication.

5. **Municipal corporations ⚖️907—Issuance of bonds without prior election held not in violation of Constitution of North Carolina.**

   Municipal Finance Act N. C. (C. S. N. C. §§ 2918–2959, as amended and re-enacted by Pub. Laws 1921 [Ex. Sess.] c. 106, § 1), authorizing municipalities to issue bonds for construction of water, light, or sewerage systems, and requiring an election before the bonds are issued only where a petition therefor is filed within 30 days after first publication of the ordinance, is not in violation of the Constitution of the state, as construed by its Supreme Court.

6. **Constitutional law ⚖️115—Bondholders of public service corporations held not protected from competition by a city made possible by a changed construction of the state Constitution.**

   The rule that contract rights acquired under the laws of a state, as then construed by its courts, may not be impaired by subsequent decisions giving such laws a different construction, cannot be extended to protect bondholders of public service corporations from competition in the business of the corporations by a city because when the bonds were issued, under the Constitution of the state, as then construed by the courts, the city was without power to issue bonds for the construction of competing works without a popular vote, but under a later and broader construction it had and exercised such power; no legal rights of the bondholders being affected thereby.

---

⚖️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Equity. Suit by John T. Hill and others against the City of Elizabeth City and others. Decree for defendants.

William M. Maloy, of Baltimore, Md., and Aydlett & Simpson, of Elizabeth City, N. C., for plaintiffs.

Meekins & McMullan and Thompson & Wilson, all of Elizabeth City, N. C., for defendants.

CONNOR, District Judge. The case was submitted upon motion by defendants to dismiss the plaintiffs' bill under the provisions of Equity Rule 29, 226 U. S. 656, 33 Sup. Ct. xxvi.

The bill discloses the following facts:

Plaintiffs Hill, Crook, and Evans allege that they are citizens and residents of the state of Maryland and owners of certain bonds issued by the Electric Light Company, of the value of $3,000, and the corporate plaintiffs, Safe Deposit & Trust Company, of Baltimore, and the Baltimore Trust Company, of Baltimore, Md., allege that they own, as trustees, a number of bonds issued by said Electric Light Company, a corporation chartered and organized under and pursuant to the laws of North Carolina, aggregating in value more than $3,000. That the authorized capital stock of said company is $100,000, divided into 1,000 shares of $100, all of which is outstanding. That out of an authorized issue of $200,000 there is outstanding bonds of said company $184,000 bearing date August 1, 1903, and running 30 years, bearing interest at the rate of 5 per cent. That the real and personal property of said Electric Light Company has been conveyed to the plaintiff Safe Deposit & Trust Company, of Baltimore, trustee for the security of the payment of the interest annually, and at maturity the principal of said bonds. That there were also deposited with the trustee, as further security for the payment of said bonds, $75,000 out of a total of $100,-000, of first mortgage, 30-year, 5 per cent. bonds of the Elizabeth City Water & Power Company, a corporation organized under the laws of North Carolina, and 200 shares of the par value of $100 each (total authorized issue of 1,000 shares, of which 725 shares are outstanding), of the said Water & Power Company. That the Elizabeth City Sewerage Company is a corporation chartered and organized under the laws of North Carolina.

The defendant city of Elizabeth City is a municipal corporation chartered and organized under the laws of North Carolina. The other defendants are the mayor and members of the board of aldermen of said city, citizens and residents of the state of North Carolina.

On September 1, 1902, an ordinance was adopted by the board of aldermen of said city granting to C. M. Ferebee, or his assigns, a franchise for the period of 60 years, to furnish light and gas to the town of Elizabeth City and to the inhabitants thereof; to construct and operate plants and works therefor, together with the privilege of using the streets and public grounds of the corporation necessary for the construction and service of said light and gas system.

The ordinance recites:

"That the board of town aldermen of the corporation of Elizabeth City are desirous of securing cheap and efficient light of said town and its in-

habitants, and gas, both for illuminating and for fuel, for private and public use."

The right is granted the said Ferebee to use the streets and grounds of said city to enable him to construct and maintain poles, lines, and other necessary structures for the ends and purposes set forth in said ordinance.

The privilege is granted said Ferebee, or his assigns, to contract with said town or city and its inhabitants for a supply of light and gas, to charge such sums of money therefor as may be agreed upon by the parties to such contracts, and to collect therefor. The corporation of Elizabeth City is also authorized to contract with the said Ferebee, or his assigns, for light and gas upon such terms as it may see fit.

On October 6, 1902, an ordinance was enacted by the board of aldermen of the corporation of said city, in which it was recited that—

"The board of town aldermen of the corporation of Elizabeth City, North Carolina, are keenly sensible of the advantage, importance and necessity of an adequate supply of pure, potable and wholesome water, both for public and private uses in the town, etc. In consideration of the premises and the health and convenience of the residents, inhabitants and citizens of the town and the mutual benefit to the property and owners thereof, in the enhanced value of the real estate within the corporation by the introduction and establishment of said improvements, therein and in consideration of the additional expense of a larger and more efficient power plant necessary to supply the said water, a franchise is granted to said C. M. Ferebee, or his assigns, for a period of sixty years to supply and furnish, within the corporate limits of said town and within whatever additions may, at any time, be annexed to said corporate limits, water and sewerage to the corporation and to the residents, citizens and inhabitants thereof, and to corporations, companies and individuals therein, desiring the same and to charge and collect therefor, and to construct, operate and maintain sewerage and waterworks therein. The right is granted to said Ferebee to use the streets, etc., of said town, by laying pipes, mains, sewers, etc., necessary for furnishing water and sewerage to the town and its inhabitants."

On the 25th day of February, 1903, the Electric Light Company of Elizabeth City was chartered and organized under and pursuant to the laws of the state of North Carolina, with an authorized capital of $100,000, which has been subscribed and stock issued therefor.

Said corporation, in accordance with the provisions of its charter, on August 1, 1903, made an issue of $184,000 (out of an authorized issue of $200,000) first mortgage, 30-year, 5 per cent. bonds, and for the purpose of securing the payment of the principal and interest thereof executed a mortgage on all of its property, real and personal, to plaintiff Safe Deposit & Trust Company, of Baltimore, Md., a corporation chartered and organized under and pursuant to the laws of Maryland.

The Elizabeth City Water & Power Company was chartered and organized under and pursuant to the laws of North Carolina, February 25, 1903, and at the same time the Elizabeth City Sewerage Company was chartered and organized under and pursuant to the laws of North Carolina.

C. M. Ferebee thereafter assigned said franchises to the Elizabeth City Electric Light (and Power) Company and the Elizabeth City Water & Power Company and the Sewerage Company. The board of

commissioners of Elizabeth City, by an ordinance duly passed on the —— day of ——, 1903, ratified and confirmed the said assignment.

The General Assembly of North Carolina at its session of 1903 (Priv. Laws, c. 99), passed an act authorizing Elizabeth City to contract with C. M. Ferebee, or his assigns, to furnish to said corporation electric light, gas, water, and sanitary sewerage for such time, not exceeding 30 years, for such consideration as to each of the board of town aldermen may deem just and expedient. The said city was also, by said act, authorized to pledge the credit of the said corporation to pay any and all installments which should accrue under and by virtue of such contracts, etc., and to levy taxes to raise funds to meet said installments, etc. The board of aldermen were authorized and directed, before entering into such contracts, to submit to the qualified voters of said city, at an election to be held for such purpose, the question whether said contracts should be made.

The board of aldermen of said town, pursuant to the authority vested in them by the said act of February 18, 1903, submitted to the qualified voters of Elizabeth City the question of ratification of the contracts proposed by the Electric Light Company, the Water & Power Company, and the Sewerage Company, at which election a majority of said voters ratified said contracts, which were thereafter on June 1, 1903, executed by the board of aldermen and the said corporations. Said contracts were to be and remain in force for 10 years from the date thereof.

Plaintiffs allege that, pursuant to, and in accordance with, the terms and provisions of said acts of the General Assembly, and the said contracts, the Elizabeth City Electric Company, and the Water & Power Company, and the Sewerage Company, proceeded to construct, erect, and have at all times maintained, plants, machinery, power houses, poles, wires, mains, and all other necessary appliances for furnishing the city and its inhabitants electric lights, water, and sewerage.

"That at the time of the original investment, Elizabeth City was not a community that could yield immediate and certain returns on the necessary capital and expenditures, but the companies had faith in the city and its future and were willing to render the service which would help to realize that growth of the city and development of its industrial and commercial enterprises which they foresaw and believed; that for 18 years, the three utility companies have served without a single dividend to its stockholders and without a dollar in salary to its officers. That the Electric Light Company's plant is of the best machinery and equipment that money can buy and is as economically operated as any plant of its capacity in North Carolina. * * * That from time to time there have been replacements and renewals of parts of the plant and large expenditures by reason of the wiring difficulties from the frequent breaking of large limbs on the many trees that line the streets of Elizabeth City. That the present facilities of the Electric Light Company are modern, adequate and efficient, and capable of providing two and one-half times the current that Elizabeth City now requires. That the plant is rated 900 kilowatt hours, the average consumption having been only 437 kilowatt hours. That service is provided 24 hours a day, 365 days in the year. That the company serves 1,500 customers in Elizabeth City and surrounding territory—supplies every customer that is there and is amply able to serve many more at reasonable rates, sanctioned by the corporation commissioner of North Carolina."

After setting out in detail the difficulties encountered in getting a supply of pure water and the expense incurred, the plaintiffs allege:

That the average daily consumption in Elizabeth City is 400,000 gallons of water a day; the capacity of the plant is 1,440,000 gallons a day; it serves 900 customers and receives from the city $4,300 a year for hydrant and street service, setting out in detail the condition, efficiency, etc., of the plant.

When the company's mains were laid, they were in full accord with every requirement of the National Board of Fire Insurance Underwriters, and while new fire regulations apply only to new construction, yet by a slight expenditure, the entire plant of the company can be made to meet the most rigid regulations that could be devised. That, without any fire engine or auxiliary equipment, the pumps in the plant of the company can, at any time, be made to throw a stream of water over the top of the highest office building or other edifice in Elizabeth City.

In respect to the contracts with the Sewerage Company substantially, and for the purpose of disposing of the motion made by defendants, the allegations are of the same import as to the other companies. There had been considerable discussion and negotiation between the officers of the Sewerage Company and the board of aldermen in regard to the extension of the sewerage system, which are set out in the bill, but are not necessary to be repeated here.

The bill alleges that, in 1892, an Electric Light Company was formed by residents of Elizabeth City and to this company a franchise was granted by the city. That there had also been granted to a local lumber mill a franchise for a pipe line to carry by pneumatic pressure, shavings, and timber refuse, from the lumber mill to the electric light plant. That the city entered into a contract with the Electric Light Company for 10 years, which in 1897 had been extended to 1907. The Electric Light Company assigned to the Electric Light & Power Company of Elizabeth City the franchise granted and the rights which it acquired under the contract made with the city. The franchise granted to Ferebee had theretofore been granted to said company.

Plaintiffs allege that—

"After the passage of the act of the General Assembly and the ratification of the contracts by the voters of said city the corporation of Elizabeth City entered into contracts with the Electric Light Company; that these contracts are in full force and effect, until 1927."

The contract with the Electric Light & Power Company of February 11, 1907, was extended from that date until April 1, 1917.

There is some obscurity in the bill in respect to whether there has been a renewal of the contracts made by the city with the companies, pursuant to the authority vested in the city by the Act of February 18, 1903, and the ratification by the qualified voters. The contract with the Electric Light & Power Company bears date June 1, 1903, and continues in force until April 2, 1907. This contract was renewed, April 2, 1907, for 10 years.

The contract with the Water & Power Company bears date June 1, 1903, and continues in force for 10 years. There is no evidence in the

records of the proceedings of the board of aldermen of any other renewals of the contracts. There is ample evidence of the continuation of service by the companies, acceptance thereof, and payment therefor by the board of aldermen. There is also evidence of regulation by the board of rates and terms of service. It is alleged in the bill that "in 1920" some negotiations were had between the board of aldermen and the officers of the Sewerage Company in which the company made it clear that further operation of the sewer under the then rates was out of the question—negotiations did not result in an adjustment of the difficulty but "led to a request by the then mayor and board of aldermen for a price upon the properties of the sewer, water and electric companies." The offer being declined by the city, "the Sewer Company announced that it would have to cease rendering service." At the request of the city the Sewer Company continued operations, "and a proposition was made by the city that it would purchase the three plants" at a price named, and "before a counter proposition could be made a suit was filed by a taxpayer praying that the city be enjoined from entering into the contract upon the terms offered by the city." Pending this suit, the offer was declined by the officers of the company. The terms of the offer by the mayor and aldermen having expired, the defendants the present mayor and aldermen were elected and were inducted into office. The mayor, by direction of the board, addressed a letter to the president of the "Public Service Corporations" requesting that he continue the sewerage service for at least three months longer, expressing "the belief that the extension of time asked for would afford an opportunity for investigation and result in an amicable arrangement mutually satisfactory to all concerned." This request was complied with and "further efforts made to finance the extension of the sewer which, for lack or failure of the city to enforce, the compulsory sewer connection and to consent to a fair compulsory rate, made it impossible."

The present board of aldermen, at the end of the period to which sewer service was extended, all efforts at adjustment having failed, addressed a letter to the president asking that the companies submit a price for the three properties. This resulted in a correspondence between the president of the three companies, beginning June 27, 1922, and concluding October 23, 1922: copies of the letters being attached to, and made a part of, the bill. Examination of these letters discloses a failure to reach an agreement as to the price at which the purchase of the properties could be made. The merits of the controversy do not involve a discussion of the motives which controlled the parties. There is no suggestion made by the president of the companies that the contracts had been renewed.

On August 30, 1922, he acknowledged the receipt of a letter from the mayor advising that—

"So far as the board of aldermen is concerned, the negotiations for the purchase of the utility properties are closed."

After protesting against the course pursued by the board, the president writes that—

"Should the board of aldermen be determined upon its unfair and unjust course, we will be forced to appeal to the courts in defense of our rights and the protection of our properties," etc.

[1] I do not find in the bill an allegation that the contracts were renewed beyond 1917, except the general allegation regarding the lighting contract, which was extended until April 1, 1917. Plaintiff's counsel argued that the acceptance of service by the companies, payment therefor, and regulations by the board of aldermen of rates, etc., constituted a recognition of the continuance of the contracts. Without regard to the question whether the terms of the Act of February 18, 1903, requiring the board to submit the question of acceptance and ratification of the contracts to a vote of the people, rendered it necessary to submit to them the question of renewal of such contracts (Wadsworth v. Concord, 133 N. C. 587, 45 S. E. 948), I am of the opinion that the course pursued by the board of aldermen and the officers of the company did not operate as a renewal, certainly not for a definite period of time, of the contracts. That the relation established by such course of conduct left each party at liberty to put an end to the relation upon reasonable notice. It is manifest that they so understood their rights and liabilities.

The expiration of the contracts did not affect the franchises held by the companies, which by the terms of the grant continued for a period of 60 years from September 1, 1902. It is held in Elizabeth City v. Banks, 150 N. C. 407, 64 S. E. 189, 22 L. R. A. (N. S.) 925, that, prior to the enactment of the Statute of 1905, Revisal, § 2916, and Private Laws 1905, c. 15, the board of aldermen had no authority to grant the franchise to C. M. Ferebee. It may be that the Private Act of 1903, chapter 99, ratified February 18, 1903, recognizes, and by reasonable interpretation validated, the grant of such franchises. It is not necessary, in the disposition of the motion to dismiss the bill herein, to pass upon the validity of the grant of the franchise to Ferebee. The grant not being exclusive does not interfere with, or restrict, the right of the city to establish, construct, and operate a system of electric lights, water, and sewerage.

"During the year 1920, after discussion with the officers of the companies regarding the sewerage service, etc., the mayor and board of aldermen requested the officers to submit a price upon the properties of the sewer, water and electric light companies." A price was named, as requested, but declined by the mayor and board of aldermen. It appears from the allegations of the bill that the officers of the sewerage company endeavored to "procure the extension of the sewer which the lack or failure of the city to enforce the compulsory sewer connection and the refusal of the city to consent to a fair and compensatory rate made impossible," they failed to do so. The bill sets out in detail two regulations regarding the sewerage situation, rates, etc.

Following much discussion between the mayor and board of aldermen and the officers of the several companies, resulting in a failure to adjust their differences or agree upon a price to be paid by the city for the properties of the companies, the board of aldermen on September 5, 1922, adopted two ordinances, providing:

"(1) For a bond issue of five hundred and fifty thousand ($550,000.00) ·to provide a combined water and electric light and power system for the said city and its inhabitants," with details as to the manner of issue, interest rate, etc., of said bonds and denying a tax to pay the principal and interest on said bonds, etc.

"(2) For a bond issue of two hundred and fifty thousand dollars ($250,000.-00) to provide a sewerage system for the said city and its inhabitants," with provisions in regard to manner of issue, rate of interest, etc., as in regard to the water and light bonds.

These ordinances were passed by virtue of authority vested in the board of aldermen and in accordance with the provisions of section 2959 of Chapter 106 of the Public Laws of the Special Session of the Legislature of North Carolina entitled "The Municipal Finance Act of 1921," ratified December 20, 1921 (Consol. Stat. of North Carolina, §§ 2918–2959).

Following the advertisement of said ordinances as required by the provisions of said statute, no petition to submit said ordinances to the voters of said city having been filed, the board of aldermen at a meeting held October 9, 1921, ordained that the bond issues be consolidated and that all proceedings, etc., which had been taken and had in respect to issuing said bonds, be ratified and affirmed. That said bonds be advertised for sale, as provided by the law of the state, etc.

The plaintiffs set out, together with the correspondence had between the president of said companies and the mayor and board of aldermen of said city, a history of the negotiations regarding the sale of the properties of said companies. From the correspondence it appears that, the companies proposed to sell to the city their properties for $375,-000, which was declined, and an offer made by the board of aldermen to buy said properties for $250,000 was rejected. The president of the companies made several offers to submit the decision of the value of said properties to arbitration, all of which are fully set out and all of which were declined, as will appear by reference to the correspondence attached to the bill. The plaintiffs allege that the properties of the companies were worth $500,000, but that, for the purpose of enabling the city to establish water, light, and sewerage system, they were willing to sell them for $375,000. Plaintiffs allege that the town of Elizabeth City, by constructing and operating a system of electric lights, water, and sewerage, for supplying said city and selling light, water, and sewerage, to the inhabitants of said city, in competition with said companies, will destroy the value of the several franchises granted to the companies, violate the terms and obligation of the contracts entered into and subsisting with said companies, and confiscate the property of said companies, in violation of the rights of said companies and the plaintiffs secured to them by the Constitution of the United States. Plaintiffs further allege that the proposed issue of bonds is violative of section 7, art. 7; section 4, art. 8, of the Constitution of North Carolina.

The bill, concludes with the prayer that the mayor and board of aldermen of Elizabeth City be temporarily and permanently enjoined from issuing and delivering bonds of Elizabeth City, or any part or portion thereof, as provided in said ordinances adopted by said board of aldermen, and from devoting or using the proceeds of said bonds

for the construction and building of municipal, electric light, water, or sewer systems or plants. That the corporation of Elizabeth City be enjoined from putting into effect a discriminatory schedule of rates, from adopting, or using, any practices, regulations, or rules making competition unfair, or unequal between the city and private companies. That said corporation be enjoined from interfering with the pipes, wires, poles, plant, and equipment of the private companies, and for general relief.

Plaintiffs base their claim for the relief, sought in the bill, primarily upon the contention that by the terms of the franchises granted to C. M. Ferebee and assigned to the Electric Light Company, Water & Power Company, and Sewerage Company, and the contracts entered into by the corporation of Elizabeth City, with said companies, and the investment made by them in the construction and maintenance of systems of electric lights, water, and sewerage, of large sums of money, and the compliance, by said companies with the terms, provisions, duties, and obligations imposed upon said companies by said contracts, and their readiness, willingness, and ability to continue to discharge such obligations and duties, the said companies have contractual rights, which the said corporation, by issuing and selling bonds, for the purposes set forth in the ordinances, providing for said bonds and the construction, maintenance of a system of electric lights, water, and sewerage for the use of said city and for sale, in competition with said companies, threaten to violate and thereby confiscate and render of no value the properties of said companies, all of which is in violation of the rights of said companies, secured to them by the Constitution of the United States guaranteeing to them the validity of the obligation of said contracts, due process, and equal protection of the law. That plaintiffs, owners and holders of the bonds of said companies, and corporate plaintiffs, the trustee holding the title to said properties, as security for the payment of the interest and at maturity the principal of said bonds, inhabitants and citizens of the state of Maryland, are entitled to invoke the jurisdiction of this court for protection and enforcement of their rights. That the Electric Light Company, Water & Power Company, and Sewerage Company are insolvent, and if the value of their property is destroyed by the acts already done and threatened to be done as set forth in the bill, if accomplished, said bonds will be without security for their payment and be utterly valueless.

Other grounds for relief are set forth in the bill and urged in the argument, based upon alleged violation of the Constitution of North Carolina, which will be dealt with later.

[2] The right of the plaintiffs to bring the suit because of their interest in the property affected by the action of the corporation of Elizabeth City is sustained in Pollock v. Farmers' Loan & Trust Co., 157 U. S. 429, 15 Sup. Ct. 673, 39 L. Ed. 759; Old Colony Trust Co. v. Omaha, 230 U. S. 100, 33 Sup. Ct. 967, 57 L. Ed. 1410.

The learned counsel for plaintiffs frankly conceded in their argument that the franchise granted to C. M. Ferebee is not exclusive. Reference to the decision of the Supreme Court of North Carolina in

Thrift v. Elizabeth City, 122 N. C. 31, 30 S. E. 349, 44 L. R. A. 427, decided in May, 1898, makes it quite certain that the board of aldermen did not intend to grant an exclusive franchise. In that case an exclusive franchise was granted by the board of aldermen to Orlando White to furnish water to the city. Douglas, J., in an able and well-sustained opinion, said:

"Those provisions of the ordinance granting the exclusive privilege to construct and maintain waterworks within the corporate limits of the town, and the exclusive use of its streets, alleys, sidewalks, public grounds, streams and bridges, come within the condemnation of section 31, art. 1, of the Constitution of this state, which declares that perpetuities and monopolies are contrary to the genius of a free state and ought not to be allowed. * * * All authorities hold that no such exclusive privilege can be granted by a municipal corporation without express legislative authority."

[3] The question arises: Does the declared purpose of the corporation of Elizabeth City to issue bonds, the proceeds of which, when sold, shall be applied to providing a combined system of water, electric light, and power system for the said city and its inhabitants, if effectuated, violate the contractual rights of the companies, or deprive them of their property, without due process of law or the equal protection of law as guaranteed by the Constitution of the United States? The answer to this question depends upon the terms of the contracts and their construction.

[4] If the terms of the franchise granted to Ferebee and assigned to the companies were of doubtful construction, it is well settled, by both state and federal decisions, that such doubt will be construed against the claim of an exclusive right by the companies. In Water Co. v. Knoxville, 200 U. S. 22, 33, 26 Sup. Ct. 224, 227 (50 L. Ed. 353), Mr. Justice Harlan, citing authorities, says:

"The doctrine is firmly established that only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government or the public has an interest. Statutory grants of that character are to be construed strictly in favor of the public, and whatever is not unequivocally granted is withheld; nothing passes by mere implication. * * * We have never departed from, or modified, these principles, but have reaffirmed them, in many cases. It is true that the cases to which we have referred involved, in the main, the construction of legislative enactments. But the principles they announce apply with full force to ordinances and contracts by municipal corporations in respect to matters that concern the public. The authorities are all agreed that a municipal corporation, when exerting its functions for the general good, is not to be shorn of its powers by mere implication. If by contract or otherwise, it may in particular circumstances, restrict the exercise of its public powers, the intention to do so must be manifested by words so clear as not to admit of two different or inconsistent meanings."

This language was used in a case involving the same question presented here, and much which is said by the learned justice, in the interpretation of the franchise then before the court, is applicable to that granted by Elizabeth City in 1902, under which plaintiffs claim the right to have the city enjoined from issuing the bonds in this case. It appears from the record in that case that—

The city of Knoxville at one time contemplated constructing and maintaining a system of waterworks, but "for some reason, not distinctly dis-

closed by the record, the city abandoned the scheme it had at one time formed of constructing its own system of waterworks. And it may be that it did not in 1882 intend or expect to ever again think favorably of such a scheme. It may also be that the water company, having knowledge of what the city had done, or attempted, prior to 1882, deliberately concluded to risk the possibility of municipal competition if the city would agree not to give to other persons or corporations the same privileges it had given to that company. The city did so agree and thereby bound itself by contract to the extent just stated, omitting, as if purposely, not to bind itself further. The agreement, as executed, is entirely consistent with the idea that while the city, at the time of making the agreement of 1882, had no purpose or plan to establish and operate its own waterworks in competition with those of the water company, it refrained from binding itself not to do so, although willing to stipulate, as it did stipulate, that the grant to the water company should be exclusive as against all other persons or corporations. We are therefore constrained by the words of agreement to hold that the city did not assume, by any contract, protected by the Constitution of the United States, to restrict its right to have a system of waterworks, independent, altogether, of the system established and maintained by the water company. If this interpretation of the contract will bring hardship, and loss to the water company, and to those having an interest in its property and bonds, the result * * * is due to the absence from the agreement between the parties of any stipulation binding the city not to do what, unless restrained, it proposes to do."

The learned justice cites and quotes from the opinions in several cases illustrative of and sustaining the principles announced, concluding:

"It is, we think, important that the court should adhere firmly to the salutary doctrine underlying the whole law of municipal corporations and the doctrine of the adjudged cases, that grants or special privileges affecting the general interests are to be liberally construed in favor or the public, and that no public body, charged with public duties, be held, upon mere implication or presumption to have divested itself of its powers."

In Hamilton Gaslight Co. v. Hamilton City, 146 U. S. 258, 13 Sup. Ct. 90, 36 L. Ed. 963, pursuant to a statute then (1855) in force in Ohio authorizing any gas company to manufacture, sell, and to furnish such quantities of gas as might be required in any city or town where located for public and private buildings, or for other purposes, with authority to lay pipes for conducting gas through the streets, etc., in such city, with the consent of the municipal authorities, and under such regulations as they might prescribe, the municipal authorities were given power to contract with any such corporations for lighting the streets, etc.

The city council was authorized to regulate the price at which gas was sold. This statute was retained when the laws relating to gas companies were codified in 1869 (66 Ohio Laws, p. 218).

The Code, of that date, contained a provision that—

"The council of any city or incorporated village shall have power, whenever it may be deemed expedient and for the public good, to erect gasworks at the expense of the corporation, or to purchase any gasworks already erected therein." (Section 423.)

By an ordinance passed in 1855, the plaintiff company was authorized to place pipes in the street, etc., to convey gas for the use of the city and its inhabitants, and the plaintiff was given the exclusive privilege of laying pipes for conveying gas in the city and of putting up pipes

in the dwellings, etc., for the term of 20 years. The city entered into contracts with the plaintiff for lighting, etc. The last contract expired January 1, 1889.

The council, on January 2, 1889, passed an ordinance, reciting the termination of the contract and declaring that the city no longer desired the company to furnish gas for lighting streets, and would not pay for any lighting furnished or attempted to be furnished thereafter, forbidding the use of lamp posts and other property of the city, and notifying the company to remove without delay any attachment or connection theretofore maintained with the city's lamp posts and other property.

The company protesting against the ordinance, in an address to the council, announced that its gas mains connected with the city's lamp posts, lamps, and the burners thereon, were filled with gas, ready and fit then and at all times for the purpose for which they were constructed and connected, and that the company was, at all times, ready and able to supply all the gas needed for the wants of the city and its inhabitants.

On January 4, 1889, the city council passed an ordinance looking to the issuing of bonds, being first approved by a popular vote, for the purpose of erecting works to supply the city and its inhabitants with gas by the city.

The gaslight company brought suit for the purpose of enjoining the city from disconnecting its lamp posts from the company's mains or lighting the city by any means other than by the company's gas, as well as from issuing bonds for the purpose of erecting gasworks for supplying the city and private consumers.

In the contentions made by plaintiffs, similar to those made here, the court adopting the decision of the state court, holding that section 2486, Revised Statutes, conferred upon the city the authority to erect gasworks at its expense whenever deemed expedient or for the public good to do so, said:

"The next contention of the plaintiff is that such legislation is within the constitutional inhibition of state laws impairing the obligation of contracts. This view is inadmissible. The statutes in force when the plaintiff became a corporation did not compel the city to use the gaslight furnished by the plaintiff. The city was empowered to contract with the company for lighting streets, * * * within its limits, but it was under no legal obligation to make a contract of that character, although it could regulate, by ordinance, the price to be charged for gaslight, supplied by the plaintiff and used by the city or its inhabitants. It may be that the stockholders of the plaintiff supposed at the time it became incorporated, and when they made their original investment, that the city would never do what evidently is contemplated by the ordinance of 1889. And it may be that the erection and maintenance of gasworks by the city at the public expense, and in competition with the plaintiff, will ultimately impair, if not destroy, the value of the plaintiff's works for the purposes for which they were established. But such considerations cannot control the determination of the legal rights of the parties."

Quoting from the opinion in Curtis v. Whitney, 13 Wall. 68–70 (20 L. Ed. 513), the court said:

"Nor does every statute which affects the value of a contract impair its obligation. It is one of the contingencies to which parties look now, in

making a large class of contracts, that they may be affected in many ways by state and national legislation."

—citing Stein v. Bienville Water Supply Co., 141 U. S. 67, 11 Sup. Ct. 892, 35 L. Ed. 622, and Turnpike Co. v. State, 3 Wall. 210, 18 L. Ed. 180, in which it is said:

"The difficulty of the argument in behalf of the Turnpike Company, and which lies at the foundation of the defense, is that there is no contract in the charter of the Turnpike Company that prohibited the Legislature from authorizing the construction of the rival railroad. No exclusive privileges had been conferred upon it, either in express terms or by necessary implication; and hence whatever may have been the general injurious effects and consequences to the company from the construction and opera-tion of the rival road, they are simply misfortunes which may excite our sympathies, but are not the subject of legal redress."

The court also held that, by virtue of the Constitution of Ohio, which provided that "no special privileges or immunities shall ever be granted that may not be altered, revoked or repealed by the General Assembly, * * * there was no escape from the conclusion that such a grant, as respects at least, its exclusive character was subject to the power of the Legislature, reserved by the state Constitution, of altering or revoking it." Skaneateles Water Co. v. Skaneateles, 184 U. S. 554, 22 Sup. Ct. 400, 46 L. Ed. 585; Madera Water Co. v. Madera, 228 U. S. 454, 33 Sup. Ct. 571, 57 L. Ed. 915.

Plaintiffs cite, for the purpose of maintaining their contention, the case of Walla-Walla v. Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341.

There, the city entered into a contract with the water company whereby the company contracted to furnish water to the city at reasonable rates to consumers, at all times during the period of 25 years. Provision was made for the avoidance of the contract upon failure of the company to substantially comply with the obligations assumed, "and until such contract shall have been so avoided, the city of Walla-Walla shall not erect, maintain or become interested in any waterworks except the ones hereinbefore referred to, save as hereinafter specified."

While the contract was in force and the stipulated rentals paid, an ordinance was passed "to provide for a system of waterworks," for the purpose of supplying the city and its inhabitants with water, empowering the city to purchase or condemn land and to issue bonds for that purpose. This ordinance was approved by a vote of the people. The water company, which had constructed a system of waterworks, under the terms of the statute and contract made in pursuance thereof, alleged that it was ready, willing, and able to perform the obligations imposed upon it by said contract, sought to enjoin the city from proceeding to issue bonds, etc. The questions involved were whether the city had authority to enter into the contract and whether, under its provisions, the city could, without violating its obligation, construct and operate a system of waterworks in competition with the water company. The contract did not provide against the city granting a franchise to other corporations to construct and operate a system of waterworks in the city.

Mr. Justice Brown said:

"The case, upon the merits, depends largely upon the power of the city under its charter. The ordinance authorizing the contract, which purports to have been passed in pursuance of this charter, declared that until such contract should be avoided by a court of competent jurisdiction, the city should not erect, maintain or become interested in any waterworks, except the one established by the company, while the ordinance of January 20, 1893. provided for the immediate construction of a system of waterworks by the city for the purpose of supplying the city and its inhabitants with water. Upon the face of the two ordinances there was a plain conflict— the latter clearly impaired the obligation of the former."

The court held that the contract did not confer upon the company any exclusive privileges and that the city had the power to enter into it and was bound by its provisions. The city was enjoined from issuing bonds for the purpose of erecting and operating a system of waterworks.

In Owensboro v. Cumberland Telephone Company, 230 U. S. 58, 33 Sup. Ct. 988, 57 L. Ed. 1389, the city, December 4, 1889, granted to the telephone company the right to erect and maintain, upon the public streets and alleys of the town, any number of telephone poles of proper size and any number of wires thereon, with the right to connect such wires with the buildings where stations are established. The right was not exclusive. The company contracted to furnish, free of charge, one telephone to each engine house and made other concessions to the town. No rent, or other charge, was imposed upon the company in consideration of the privilege granted. In January, 1909, the city council passed an ordinance requiring the company to remove its poles and wires, within a reasonable time after the passage of the ordinance, and upon failure to do so the mayor was directed to have them removed. The company was granted the right to purchase from the city a franchise authorizing it to maintain its poles, wires, etc. The company sought to enjoin the city from enforcing the ordinance, the contention being that it was an impairment of the company's contractual property rights, etc. The court sustained the contention of the company, holding that the ordinances granting the right to erect and maintain its poles in the streets was a property right; that the city council was authorized to make the grant; and that it could not be withdrawn as attempted by the ordinance. Four of the justices dissented from the judgment and opinion.

In Boise City v. Boise Water Co., 230 U. S. 84, 33 Sup. Ct. 997, 57 L. Ed. 1400, the city granted, October 3, 1889, to the water company a franchise to lay and repair water pipes in, through, and along and across the streets of the city, etc. This franchise, with its provision, was accepted and the grantees immediately began the construction of their plant. A similar franchise was, July, 1890, granted to another water company, which also accepted the franchise and expended much money. in the construction of another water supply system. These franchises were assigned to the Boise Water Company, which thereafter made large expenditures in improving the plants, etc. On June 7, 1906, an ordinance was passed by the board of aldermen requiring the Boise Water Company, assignee of said franchise, to pay to said

city a monthly license of $300 for the privilege granted by the ordinance of October 3, 1889. The clerk was directed to notify the company to pay such license fee. In an action wherein the city endeavored to enforce the payment of such license fee, the court held that the grant of the franchise was based upon a valuable consideration and, when accepted and money expended by the grantees, or their assigns, vested in them a property right of which they could not be deprived, nor could the city in the absence of any reservation of power in the grant impose such a charge. The case is distinguishable from the instant case in that the ordinance adopted by the board of aldermen does not attack the validity, nor impose any burdens upon the companies for the use and enjoyment of the franchise..

The case of Russell v. Sebastian, 233 U. S. 195, 34 Sup. Ct. 517, 58 L. Ed. 912, L. R. A. 1918E, 882, Ann. Cas. 1914C, 1282, very clearly illustrates the distinction between the cases wherein the city undertakes to interfere with or deprive the grantor of a franchise, and such as the instant case, when the franchise, not being exclusive or prohibiting the city from constructing and operating a system of public utilities, undertakes to exercise such right · recognizing and respecting the contract rights of the grantee of the franchise. In that case the Constitution of California, art. 11, § 19, provides that any individual or corporation in cities where no public works are owned and controlled by municipality for supplying the city with lights and water shall under the direction of the superintendent of streets, and under such general regulations as the municipality may prescribe, have the privilege of using the public and laying pipes, etc., so far as may be necessary for introducing into and supplying the city and its inhabitants with light and water. While this provision of the Constitution was in effect, the Economic Gas Company laid its pipes and undertook to manufacture and distribute gas within the city of Los Angeles for lighting purposes, there being no gasworks in the city owned or controlled by the city. The company extended its system and was, at the date of the change in the Constitution, supplying gas to a large number of the inhabitants.

In 1911 a change was made to the Constitution, whereby section 19, art. 11, was amended by substituting a provision whereby any municipal corporation was authorized to establish and operate public works for supplying its inhabitants with lights, water, etc. "Such works may be acquired by original construction or by the purchase of existing works, including their franchises or both. Persons or corporations may establish and operate works for supplying the inhabitants with such service, upon such conditions and under such regulations as the municipality may prescribe. * * * · A municipal corporation may furnish such services to inhabitants." Thereupon, by ordinance, March 26, 1911, the city of Los Angeles provided that no one should exercise any franchise or privilege to lay or maintain pipes in the streets for conveying gas, water, etc., without having obtained a grant from the city, "unless such person or corporation might be entitled to do so by direct and unlimited authority of the Constitution of California, or the Constitution and laws of the United States." Another ordinance

was adopted declaring that it should be unlawful to make any excavation in a street for any purpose without written permission from the board of public works.

The Economic Gas Company, claiming that by virtue of the provisions of article 11, § 19, of the Constitution of 1879, it had acquired a property right to lay and maintain its pipes in the streets, directed the plaintiff, its employee, to open certain streets for the purpose of extending its pipes and enlarge its capacity to supply gas to the inhabitants of the city. Plaintiff, Russell, was forbidden to open the streets and, upon his refusal to desist, was arrested and sued out a writ of habeas corpus. The state court dismissed the writ, whereupon a writ of error was granted. The Supreme Court held that the gas company acquired, under the provisions of article 11, § 19, of the Constitution of 1879, a franchise which was a property right, to open the streets for the purpose of laying and maintaining pipes. That this property right was within the protective provisions of the Constitution of the United States. That the provision of the amended or substituted section of the Constitution of 1911 and the municipal ordinances adopted in pursuance thereof were ineffectual to impair this right, and that the company was entitled to extend its mains for the purpose of distributing its supply to the inhabitants of the city.

I have examined each case relied upon by plaintiffs to sustain their contention that either by the terms of the franchise or the contracts made by Elizabeth City the ordinance providing for issuing bonds for the purpose of providing funds to construct and operate a system of light, water, and sewerage works and carrying into effect such purpose violate the contract rights of the companies or take their properties without due process of law. I conclude:

First. That the franchises, if a valid grant therefor was made to Ferebee, are not exclusive, nor do they deprive the city of the right conferred upon it by the provisions of section 2832, Consol. Statutes, "to acquire, establish and operate waterworks, electric lights * * * and sewer systems" nor do the provisions of the statute violate any contractual right of the companies.

Second. That the contracts entered into between Elizabeth City and the companies expired prior to the adoption of the ordinance of September 5, 1922, and October 9, 1922.

[5] The plaintiffs allege that the ordinance providing for the construction of a system of light, water, and sewerage, and the issuance of bonds, without submitting the question to a vote of the qualified voters of the city, violates the provision of article 7, § 7, of the Constitution of North Carolina.

Prior to the decision of the Supreme Court of the state in Fawcett v. Mt. Airy, 134 N. C. 125, 45 S. E. 1029, 63 L. R. A. 870, 101 Am. St. Rep. 825, December 18, 1903, it was held that the construction and maintenance of a system of light, water, and sewerage was not within the meaning of the words "necessary expenses," as used in the state Constitution, art. 7, § 7. In that case, the court, in an opinion written by Justice Montgomery, expressly overruled the earlier cases. Mayo v. Washington, 122 N. C. 5, 29 S. E. 343, 40 L. R. A. 163. This de-

291 F.—14

cision has been uniformly, and in a large number of cases cited in the Annotated Edition of the 134th Volume, approved and has been and is now the fixed, accepted law of the state. Connor & Cheshire, Anno. Const. 319. In accordance with these decisions the Legislature enacted the "Municipal Finance Act;" Consol. Statutes, subc. 3, § 2936.

This act was re-enacted, as amended, by chapter 106, Laws of Extra Session 1921. By this act municipalities were authorized, by complying with the requirements and provisions of the act, to issue bonds for "any purpose or purposes for which it may raise or appropriate money." Section 2937. The statute, section 2791, having authorized municipal corporations to construct and operate lighting, water, and sewerage systems, there can be no doubt of their power to issue bonds for such purposes. Section 2947 (1) provides for an election before bonds are issued, upon a petition to be filed within 30 days after the first publication of the ordinance. No such petition having been filed, the board of aldermen, on the 9th day of October, 1922, adopted an ordinance directing the issuance of the bonds. I find no valid objection to the proceedings taken by the board of aldermen, entitling plaintiff to enjoin the issuance of the bonds.

[6] Plaintiffs allege that the Supreme Court of North Carolina having held in a line of decisions, beginning with Mayo v. Washington, 122 N. C. 5, 29 S. E. 343, 40 L. R. A. 163; Thrift v. Elizabeth City, 122 N. C. 31, 30 S. E. 349, 44 L. R. A. 427, March, 1898, and other cases cited in Connor & Cheshire Annotated Constitution, 318 et seq., prior to the date of the bonds issued by the Electric Light Company, that water, light, and sewerage were not "necessary expenses," and that municipalities could not, without the approval by a vote of a majority of the qualified voters, contract debts or issue bonds for the purpose of constructing or operating such utilities. That the purchasers of the bonds issued by the Electric Company were entitled to rely upon such construction of the state Constitution which prohibited Elizabeth City from issuing bonds for the purpose of constructing and operating a system of light, water, and sewerage without the approval of the qualified voters of the city. That such right is not affected by the overruling of those cases in Fawcett v. Mt. Airy, supra, and other cases. This contention is based upon a line of decisions of the Supreme Court of the United States relating to municipal bonds. The principle invoked by the plaintiffs is discussed in Gelpcke v. Dubuque, 1 Wall. (68 U. S.) 195, 17 L. Ed. 520; Wilkes County v. Coler, 180 U. S. 506, 21 Sup. Ct. 458, 45 L. Ed. 642.

The application sought to be made of this principle in the instant case is not sustained by any authority cited by counsel. The purpose for which it was originally invoked was to sustain the validity of public securities issued and purchased upon the faith of a long and uniform line of state decisions upon the authority of which the bonds were issued and purchased. Mr. Justice Swayne, quoting from the opinion in Ohio Life & Trust Co. v. Debolt, 16 How. 432, 14 L. Ed. 997, says:

"The sound and true rule is that if the contract when made was valid by the laws of the state as then expounded by all departments of the government, and administered in its courts of justice, its validity and ob-

ligation cannot be impaired by any subsequent action of legislation of the state, or decision of its courts, altering the construction of the law."

There is no suggestion that, by adopting a construction of the Constitution which enlarged the power of municipalities to provide for public utilities for supplying light, water and sewerage, that the validity and obligation of bonds issued by authority of a vote of the people is affected. The principle is one of narrow application and its adoption strongly opposed in a dissenting opinion by Mr. Justice Miller. The rule is well settled that federal courts will follow the latest decisions of the state court, construing the Constitution of the state—the Dubuque and other cases following it are exceptions. The court declined to apply it in Wilkes County v. Coler, supra. It is also worthy of note that in the Mayo Case the present Chief Justice of North Carolina wrote a strong dissenting opinion. The Fawcett Case was decided December 18, 1903. The Electric Light Company was chartered February 25, 1903. It does not appear from the bill when the bonds were issued or acquired by plaintiffs. It is doubtful whether, from any viewpoint, the plaintiffs come within the limitations prescribed by the court in the Dubuque Case. The argument made by the learned counsel for plaintiffs is interesting but not convincing.

There is much in the bill critical of the course pursued by the board of aldermen which cannot affect the legal rights of the city. There are also a number of allegations respecting the course proposed to be pursued by the city and its officers in regard to the operation of the proposed system of utilities, which it is alleged would be injurious to the properties of the companies. The only corporate act of the city is the adoption of the ordinance which expresses the purpose of the board. of aldermen to provide for a system of light, water, and sewerage, for the use of the city and its inhabitants, and the issuance of bonds for the purpose of carrying such purpose into effect. No suggestion is made in the ordinance that any interference with the physical properties, their operation, or, the franchises or privileges claimed by the companies, is contemplated, nor is there any suggestion that unfair competition with them in the use of their property and exercise of their franchises or chartered rights is proposed. So far as the legal rights of the companies under their charters and franchises go there is no suggestion of any corporate action by the city affecting their properties or their franchises or the use of them.

The sole question, therefore, is whether by issuing bonds and using the funds derived from their sale in the construction and operation of a system of light, water, and sewerage for supplying the city and its inhabitants, the franchises or properties of the companies are confiscated, or destroyed, or the contractual rights, within the protective provisions of the Constitution of the United States, or the Fourteenth Amendment thereto, violated. For the reasons set forth at more length than is necessary, but in deference to the learned and able argument of counsel for plaintiffs, I am constrained to hold that the plaintiffs are not entitled to the relief demanded in the prayer or to maintain their bill. A decree will be signed dismissing the bill at the cost of the plaintiffs.